**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Cheryl Ann KUNKLE, Appellant.**

Superior Court of Pennsylvania.

Submitted July 29, 2013.

Filed Nov. 6, 2013.

Thomas A. Jones, Mt. Pocono, for appellant.

Mark S. Matthews, Assistant District Attorney, Stroudsburg, for Commonwealth, appellee.

BEFORE: ALLEN, COLVILLE *, and STRASSBURGER *, JJ.

* Retired Senior Judge assigned to the Superior Court.

OPINION BY ALLEN, J.:

Cheryl Ann Kunkle ("Appellant") appeals from the judgment of sentence imposed after a jury convicted her of criminal homicide, criminal solicitation to commit criminal homicide, aggravated assault, burglary, and tampering with or fabricating physical evidence.[1] We affirm.

The trial court summarized the evidence adduced at trial as follows:

On Friday, November 16, 2001, Pennsylvania State Troopers from the Fern Ridge Station responded to the home of Benjamin Amato ("Victim"), located at 69 Sundance Drive, Chestnuthill Township, Monroe County, Pennsylvania for a welfare check. [N/T: Volume I, 2/6/07, p. 64] At the residence, the Troopers found the body of [the victim], who had been deceased for approximately four days, at the base of a stairway. [N/T: Volume II, 2/7/07, p. 131] The investigation revealed that [the victim] had been killed sometime between 1915 hours (7:15 p.m.) on Monday, November 12, 2001 and Friday, November 16, 2001, and that the Victim died as a result of blunt force trauma to his head. [N/T: Volume II, 2/7/07, p. 165.] Dr. Samuel D. Land, a board certified anatomic and clinical forensic pathologist, testified that in his opinion, to a reasonable degree of medical certainty, Victim died as a result of three to four blows to his head. [N/T: Volume II, 2/7/07, p. 175.] The manner of death was ruled homicide by the coroner. [N/T: Volume II, 2/7/07, p. 165.]

At trial, the Commonwealth introduced strong circumstantial evidence tying [Appellant] to the victim's homicide. Evidence was presented through exten-

1. 18 Pa.C.S.A. § 2501(a); § 902(a) and § 2501(a)(F1); § 2702(a)(F1); § 3502(a)(F1); § 4910(1)(M2).

sive testimony as well as numerous exhibits including photographs of the crime scene, cassette tape recordings, phone records, a letter from [Appellant] to Victim, *etcetera*. The investigation revealed that: (1) there was no sign of forced entry into Victim's home and entry was made through an unlocked garage door [N/T: Volume I, 2/6/07, pp. 93–96]; [N/T: Volume II, 2/7/07, p. 130]; (2) Victim was attacked in the basement stairwell by someone lying in wait at the top of the steps [N/T: Volume IV, 2/9/07, p. 619]; (3) he was apparently sprayed with a chemical irritant which was identified as "pepper spray" [N/T: Volume I, 2/6/07, pp. 231–232], [Volume VI, 2/13/07, p. 960]; and (4) he was struck numerous times with a blunt force object. [N/T: Volume II, 2/7/07, p. 175.] Blood splatter was found about four to five feet from the Victim coming away from him, as well as approximately eight to ten feet from him back towards the base of the stairs where he was found, and on the radiator and the paneling right above the Victim's head. *Id.* at 133–135. There were also linear bloodstains found on the wood flooring at the top of the steps, which showed movement through the pool of blood. *Id.* at 141. It was in this pool that a boot track was discovered. *Id.* at 142. Corporal Joseph Racho testified that this meant the person wearing the boot had to have stepped in blood prior to the print being deposited there. *Id.* at 143.

Corporal Wilson used photographs of the crime scene to show the jury various impact marks found during investigation procedures along the walls of Victim's residence. [N/T: Volume II, 2/7/02, p. 238.] The marks started from the first floor in the area of Victim's bathroom door and came down the steps to the basement where Victim's body was found. *Id.* There were forty-two impact marks discovered, twenty-two of which had blood either in them or around them. *Id.*

During the Commonwealth's case in chief, John Weader, a forensic scientist, was called to the stand and testified that he found an active ingredient used in various self-defense sprays, such as mace or pepper spray, on the towel, heater cover, linoleum, and wood paneling samples from the crime scene that he analyzed. [N/T: Volume VI, 2/13/07, p. 960.] Gina Musante, a DNA Analyst for the Pennsylvania State Police, testified that, in a sample from the top of a speaker located on the floor of Victim's residence, she found more than one source of DNA. [N/T: Volume IV, 2/9/07, pp. 652–653.] Similarly, the sample recovered from the storm door of Victim's residence revealed one source of DNA that did not match Victim. *Id.* at 658.

Gregory Rowe, [Appellant's] son, testified that [Appellant] told him that she killed [the victim]. [N/T: Volume III, 2/8/07, p. 364.] He testified that [Appellant] told him she sprayed Victim with some type of mace, knocked him down the stairs, and beat him with a baseball bat until he was dead. *Id.* at 365. Rowe stated that [Appellant] had him purchase a can of mace for her two to three weeks before Victim's death. *Id.* at 373–374.

William Terlesky, [Appellant's] father's work partner, testified that while [Appellant] was sitting in his car one morning she told him that she killed [the victim] and that she had confessed to her boyfriend, Officer Marty Reynolds, as well, but she was afraid Reynolds was going to turn her in. [N/T: Volume V, 2/12/07, pp. 792, 794.] The following day, [Appellant] asked Terlesky to retrieve a pair of shoes, a bat, and gloves that she had thrown out on Camp Akiba Road and help her burn them. *Id.* at

797. Terlesky further testified that [Appellant] told him she waited at Victim's house for Victim to come home, hit him in the head at the top of a set of stairs, and then fled out of a side door onto a deck. *Id.* at 801–802. She also remarked that "he went down like a pussy." *Id.* Terlesky stated that when he asked [Appellant] why she was limping, she responded by telling him she hurt it when she jumped off Victim's deck and hit a boat as she was leaving Victim's residence. *Id.*

Marty Reynolds, a former police officer for the Pocono Mountain Regional Police, and boyfriend to [Appellant], testified that [Appellant] confessed to him about killing Victim. [N/T: Volume IV, 2/9/07, p. 717.] When Mr. Reynolds was at [Appellant's] home, [Appellant] pulled down her jeans revealing bruises on the left portion of her thigh and stated that "I was there," and "we fought all the way down the steps." *Id.* at 715, 717.

Magisterial District Judge Debbie York was called to testify regarding [Appellant's] behavior in her courtroom. When Victim was found not guilty of harassment on July 24, 2001, [Appellant] stood up and said: "What do I have to do fucking kill him to get him to leave me alone?" [N/T: Volume III, 2/8/07, p. 488.]

Trial Court Opinion, 9/24/07, at 3–6.

Additionally, the trial court explained:

During the Commonwealth's case in chief, evidence was introduced through testimony that [Appellant] attempted to hire April Steinhauser and Nathaniel Evans to kill Victim. [N/T: Volume V. 2/12/07, pp. 747–749, 906.] April testified that [Appellant] said she wished she knew somebody who would "knock him [Victim] off" or kill him to which April responded that she knew someone who would do so. [N/T: Volume IV, 2/9/07, P. 674.] April stated that she and [Appellant] went to [the victim's] house to plan how the murder was going to occur. *Id.* at 675. Two scenarios were discussed: (1) at first, "he [Nathaniel] was going to go into the garage while [the victim] was sleeping and go up the steps and into [Victim's] bedroom and then ... make it look like a robbery; (2) but then [Appellant] decided she would rather have Nathaniel follow Victim up the driveway ... and shoot Victim from behind some trees when he stepped out of his truck." *Id.* April testified further that [Appellant] was going to pay $5,000 (half up front and half when it is done) to her and Nathaniel to "knock off" Victim, but it later dropped down to $3,000 because [Appellant] realized she could not afford to pay $5,000. *Id.* April stated that [Appellant] gave her $1,500 along with a picture of Victim to give to Nathaniel. *Id.* at 677.

*Id.* at 8–9.

The trial court recited the procedural history of this case as follows:

[Following Appellant's arrest on November 3, 2005], [o]n April 16, 2006, [Appellant] filed an Omnibus Motion. On July 24, 2006, [Appellant] filed a Brief in Support.

On November 8, 2006, the [trial court] entered an Opinion and Order on [Appellant's] Omnibus Motion which granted in part and denied in part.

On January 10, 2007, [Appellant] filed a Motion in Limine.

On January 18, 2007, [the trial court] entered an Opinion and Order denying [Appellant's] Motion in Limine.

On July 7, 2007, [following her February 15, 2007 jury trial conviction], [Appellant] filed a Post–Sentence Motion. On August 6, 2007, [Appellant] filed a Brief in Support.

On September 24, 2007, [the trial court] entered an Opinion and Order

denying [Appellant's] Post–Sentence Motion.

On January 14, 2013, [after the affirmance of Appellant's judgment of sentence on her first direct appeal], [the trial court] granted [Appellant's] PCRA Petition insofar as she sought reinstatement of her direct appellate rights [regarding issues abandoned by prior appellate counsel].

On January 29, 2013, [Appellant] filed a Notice of Appeal. On February 4, 2013, we ordered [Appellant] to file a Concise Statement.

Trial Court Opinion, 3/1/13, 1–2 (footnotes omitted). The trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. Should statements made while in custody without a knowing waiver of one's right to remain silent in response to police questioning be allowed at trial?

2. Should statements made by a decedent be admitted at trial without fitting into one of the recognized exceptions to hearsay?

3. Should a solicitation to commit homicide be severed from a criminal homicide charge when the two matters concern disparate actions in time and place?

4. Should testimony from a custody conciliation conference be permitted when a local rule prohibits the use of such testimony?

5. Does a defendant have the right to impeach a Commonwealth's witness by going into his or her criminal history?

Appellant's Brief at 7.

Appellant's first issue challenges the admissibility of statements she made to law enforcement on November 3, 2005. Appellant posits:

There are, basically, two issues at play in regards to the suppression of these statements. The first is whether [Appellant] engaged in spontaneous utter-ances that were not responsive to questions by police[,] and the second is whether she was denied her sixth amendment rights if her statements were made in response to custodial interrogation.

Appellant's Brief at 10.

 It is well settled that "[o]ur Rules of Evidence vest the trial court with the authority to determine the admissibility of evidence[.]" *Rettger, et al. v. UPMC Shadyside, et al.*, 991 A.2d 915, 925 (Pa.Super.2010). "[A] ruling [on the admissibility of evidence] will only be reversed upon a showing that the trial court abused [its] discretion." *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 775 (2004) (internal citation omitted). Based on our review of the record, we find that Appellant's statements were admissible spontaneous utterances, which were not secured in violation of Appellant's sixth amendment rights.

We have explained:

Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of her *Miranda* rights. *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa.Super.2001), *appeal denied*, 569 Pa. 716, 806 A.2d 858 (2002). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." *Miranda* [*v. Arizona*], *supra* [384 U.S. 436] at 444, 86 S.Ct [1602] at 1612, 16 L.Ed.2d [694] at 706 [ (1966) ]. "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Commonwealth v. Gaul*, 590 Pa. 175, 180, 912 A.2d 252, 255 (2006), *cert. denied*, 552 U.S. 939, 128 S.Ct. 43, 169 L.Ed.2d 242 (2007).

*Commonwealth v. Williams,* 941 A.2d 14, 30 (Pa.Super.2008).

 Instantly, Appellant was in custody when she gave statements to law enforcement on November 3, 2005. In order to avoid suppression based on a violation of *Miranda,* "it is the Commonwealth's burden to establish whether [a defendant] knowingly and voluntarily waived his *Miranda* rights. In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Commonwealth v. Cohen,* 53 A.3d 882, 885–886 (Pa.Super.2012). The record establishes that the Commonwealth met its burden of proof. During the suppression hearing, Appellant admitted that she was given *Miranda* warnings on November 3, 2005. She conceded that she was given the warnings "before [Appellant] [was] put in the [trooper's] car from the jail[.]" N.T., 5/17/06, at 65. She noted that the trooper Mirandized her "in front of ... [two witnesses]." *Id.* Appellant agreed that she "understood the Miranda warnings." *Id.*

We have explained:

In considering whether a defendant has validly waived his *Miranda* rights, the trial court engages in a two-pronged analysis: (1) whether the waiver was voluntary, in the sense that [the] defendant's choice was not the end result of governmental pressure[;] and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Commonwealth v. Pruitt,* 597 Pa. 307, 325, 951 A.2d 307 (2008).

Here, the trial court conducted the requisite two-pronged analysis and after "review[ing] the totality of the circumstances under which any and all statements were made by [Appellant] to the police on November 3, 2005[,]" declined to suppress Appellant's statements. *See* Trial Court Opinion, 11/8/06, at 15, 19. In denying suppression, the trial court reasoned:

Corporal Shawn Williams testified at the May 17, 2006 omnibus hearing that on the morning of November 3, 2005, he and Corporal Thomas McAndrew arrived at the Monroe County Correctional Facility to pick up [Appellant,] who had not yet been released on the solicitation charges. [Appellant] was arrested for homicide and related charges, including solicitation to commit murder, and was transported to the offices of MDJ Whitesell for arraignment. (N.T., 5/17106, pp. 19–20.) At approximately 9:03 a.m., in the presence of two correction officers, [Appellant] was read her *Miranda* warnings. [Appellant] understood and acknowledged the warnings. [N.T., 5/17/06, p. 21.] The *Miranda* warnings as given specifically included her right to counsel and to have counsel present for any interview. [N.T., 5/17/06, pp. 22–23.]

While enroute to MDJ Whitesell's office, [Appellant] was very demeaning to the Troopers. She called them liars and attempted to engage them in conversation, specifically asking them what they were basing their facts on. [N.T., 5/17/06, p. 21.] In response, Corporal Williams advised [Appellant] that her son, Gregory Rowe, was assisting the State Police with information and that her father's friend, Gerry Terlesky, was also cooperating and providing information to them. [N.T., 5/17/06, p. 22.] Throughout the 30 minute trip to the magistrate's office, [Appellant] continued to engage the Troopers in conversation even after being told to be quiet and read her paperwork. [N.T., 5/17/06, p. 23.] Upon arriving at the magistrate's office, [Appellant] engaged in conversation with members of the media and

continued to engage in conversation with Corporal Williams while they waited for MDJ Whitesell. [N.T., 5/17/06, p. 24.] Corporal Williams testified that [Appellant] made the following statements: "I should have talked to you but my family and attorney told me not do (sic). I should have just came to you." [N.T., 5/17/06, pp. 24–25.] Even after being arraigned, [Appellant] continued to disparage the police and the investigation and said she should have kept her mouth shut.

[Appellant's] assertion that her *Miranda* rights were violated at any time is absolutely without merit. It has been demonstrated by a preponderance of evidence that [Appellant's] statements were given after *Miranda* warnings were read to her by Corporal Williams, Corporal McAndrews and by MDJ Whitesell. Furthermore, Corporal Williams told [Appellant] to keep quiet and read her paperwork. [N.T., 5/17/06, p. 23.] The conduct of the police during the transport of [Appellant] to the magistrate's office was not designed, expected, or likely to produce an inculpatory statement from [Appellant]. [Appellant] asserts that soliciting a statement "does not require a direct inquiry, but only requires that there be an effort made to cause the defendant to speak." Specifically, [Appellant] claims that Corporal Williams' comment that her son, Gregory Rowe, was a cooperating witness and was offering allegedly inculpatory evidence against her was clearly designed to require a response. [Brief, 7/24/06, p. 15.] However, under the circumstances in the present case, that argument has no merit. Corporal Williams testified that he informed [Appellant] of her son's cooperation only after she asked what they were basing their facts on. [N.T., 5/17/06, p. 21.] Clearly, it was [Appellant] who solicited information from the officers; not the other way around.

Therefore, we find that [Appellant's] statements during the trip to the magistrate's office and while waiting for arraignment were self-initiated and were not made in response to questions by the police; rather, they were spontaneous utterances that were clearly gratuitous.

Trial Court Opinion, 11/8/06, at 17–19.

We agree with the trial court and find that Appellant's challenge to the trial court's admission of her November 3, 2005 statements is without merit. *See Cohen*, 53 A.3d at 885–886; *see also Commonwealth v. Garvin*, 50 A.3d. 694, 698 (Pa.Super.2012) (internal citation omitted) ("[A] statement made in a custodial setting would not be suppressed where the suspect 'spontaneously' 'blurts out' the statement ..."); *Commonwealth v. Gaul*, 590 Pa. 175, 912 A.2d 252, 255 (2006) ("Volunteered or spontaneous utterances by an individual are admissible even without *Miranda* warnings.").

 We further find that Appellant's sixth amendment right to counsel was not violated by the admission of her November 3, 2005 statements to law enforcement, which were obtained after Appellant received *Miranda* warnings.

A defendant may waive his/her Sixth Amendment right to counsel so long as the waiver is voluntary, knowing, and intelligent. *Patterson v. Illinois*, 487 U.S. 285, 292, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). Although a defendant's *Miranda* rights have their source in the Fifth Amendment, a defendant who is admonished with the warnings set forth in *Miranda* has been sufficiently apprised of the nature of his/her Sixth Amendment rights, and thus a waiver of his/her *Miranda* rights may constitute a waiver of both the Fifth and Sixth Amendment rights to counsel. *Id.* at 296, 108 S.Ct. 2389; *see also Montejo v.*

*Louisiana,* 556 U.S. 778, 129 S.Ct. 2079, 2085, 173 L.Ed.2d 955 (2009).

The determination whether an accused has knowingly and voluntarily waived his constitutional rights depends on the facts of each particular case. *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). These circumstances include the background, experience, and conduct of the accused. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), *overruled in part on other grounds, Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The government has the burden to prove, by a preponderance of the evidence, that the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Winther,* 2011 WL 5837083, at *4 (E.D.Pa. November 18, 2011). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude" that the constitutional rights to counsel have been waived. *Moran,* 475 U.S. at 421, 106 S.Ct. 1135 (quoting *Fare,* 442 U.S. at 725, 99 S.Ct. 2560). With respect to constitutional rights, "courts should indulge every reasonable presumption against waiver." *Brewer* [*v. Williams* ], 430 U.S. [387] at 404, 97 S.Ct. 1232 [51 L.Ed.2d 424 (1977) ] (quoting *Johnson,* 304 U.S. at 464, 58 S.Ct. 1019).

*Commonwealth v. Hill,* 42 A.3d 1085, 1091 (Pa.Super.2012).

Here, the foregoing parameters were met and the trial court cogently determined that Appellant's right to counsel was not violated. Specifically, the trial court explained:

[Appellant] claims that her constitutional right to counsel was violated because she was questioned without the presence of her attorney, Jeffrey Velander. Attorney Velander represented [Appellant] in connection with the previous solicitation to commit homicide charges and [Appellant] asserts that she believed he was still her attorney. [N.T., 5/16/06, p. 60.]

"Regarding the validity of a waiver of the right to counsel, once a suspect has ambiguously requested to contact an attorney, a factor is, of course, whether the suspect or the police have initiated subsequent conversation leading to the incriminating statement."

*Com. v. Hubble* [509 Pa. 497], 504 A.2d 168, 177 (Pa.1986) (citations omitted). "However, this is only one factor, albeit an important one, in the evaluation of whether the right to counsel was knowingly, intelligently and voluntarily waived." *Id.* Courts usually adopt a totality of the circumstances approach in evaluating waivers. *Id.* A knowing, intelligent, and voluntary waiver of counsel need only be proved by a preponderance of evidence. *Com. v. Scarborough* [491 Pa. 300], 421 A.2d 147, 153 (Pa. 1980) (citations omitted).

When MDJ Whitesell took the bench for the arraignment, [Appellant] was once again advised of her rights, including her right to counsel. [N.T., 5/17/06, p. 25.] After being arraigned, [Appellant] was transported to the Pennsylvania State Police Barracks in Swiftwater for processing. At approximately 11:00 a.m., [Appellant] asked if she could con-

tact an attorney. At that time she was taken into the patrol room and Corporal Williams dialed the number she had given to him. [Appellant] called Attorney Jeffrey Velander's office, spoke with his secretary, Patti; and was told that Attorney Velander was in court and was not able to take the call. [N.T., 5/17/06, pp. 26–27.] Whether or not [Appellant] actually spoke with Attorney Velander is immaterial. Upon her request, [Appellant] was given the opportunity to speak with Attorney Velander. After she hung up, [Appellant] advised Corporal Williams that she had been unable to speak with Attorney Velander because he was in court; nevertheless, Corporal Williams asked [Appellant] if he could interview her so that she could give her set of facts and her version of what was going on. Even after telling Attorney Velander's secretary that she would not answer their questions, [Appellant] indicated she had no problem with an interview and agreed to speak with them. [N.T., 5/17/06, pp. 27–28.]

[ ] Even though Corporal Williams' request for an interview came after [Appellant] requested to speak with her attorney, thus initiating subsequent conversation with [Appellant], we conclude that [Appellant's] voluntary consent constitutes a waiver of her right to have counsel present during the interview. Prior to beginning the interview, [Appellant] was once again *Mirandized* and she acknowledged that she understood her rights, and once again consented to the interview. Furthermore, the evidence clearly shows that [Appellant] was fully aware of her right to counsel, having been given her *Miranda* warnings on numerous occasions throughout the day.

Trial Court Opinion, 11/8/06, at 19–22 (internal footnotes omitted).

Our review of the record supports the trial court's rationale for determining that Appellant's right to counsel was not violated. Significantly, the record shows that Appellant agreed that "[the trooper] told [Appellant] that [she] had the right to an attorney if [she] requested one[.]" N.T., 5/17/06, at 65. Likewise, the record is devoid of evidence that Appellant was coerced into waiving her right to counsel. *See Moran, supra,* at 421, 106 S.Ct. 1135; *see also Hill, supra,* at 1091. Further, Appellant's statements were not obtained in contravention to the United States Supreme Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

We have explained,

In the landmark case of *Miranda v. Arizona, supra,* the U.S. Supreme Court held that where an individual states that he wants an attorney, the interrogation must cease until an attorney is present. Fifteen years later, in *Edwards v. Arizona, supra,* the Supreme Court, as a corollary to its earlier decision in *Miranda,* adopted a bright-line rule that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [An accused having] expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Commonwealth v. Davis,* 388 Pa.Super. 224, 565 A.2d 458 (1989) (quotations and some citations omitted).

Our Supreme Court recently expressed: For the *Miranda/Edwards* rule to apply, there must be an unequivocal invo-

cation of the right to counsel[.] The Supreme Court explained in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) that "to avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether the right to counsel was invoked by the accused is an "objective inquiry." *Id.* at 458–59, 114 S.Ct. 2350. Effective assertion of the Fifth Amendment right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis omitted); *see also Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 61 (2003) (quoting *McNeil's* holding in this regard). If the accused makes an ambiguous or equivocal reference that would lead an officer, in light of the circumstances, to believe that the accused *might* be invoking the right to counsel, the police interrogation need not cease. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis supplied). Instead, the suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

*Commonwealth v. Champney*, —— Pa. ——, 65 A.3d 386 (2013).

Instantly, the record indicates that while Appellant was being processed at Swiftwater Barracks following her arraignment on the homicide charge, she "asked if she could contact an attorney." N.T., 5/17/2006, at 27. Appellant had already been read her *Miranda* warnings prior to being transported from the jail to her arraignment. *Id.* at 21–22. Trooper Shawn Williams testified as follows.

I took her into the patrol room and she gave a number for me to dial and which I did. And it was Attorney Jeffrey Velander's phone number. Obviously, I only heard one side of the conversation, but [Appellant] identified herself to who she said was [Attorney Velander's secretary] and asked where [Attorney Velander] was. And it was indicated to her from her response that he was not available to take a call. . . .

When she got off the phone, she informed me that Attorney Velander was in the Court of Common Pleas and was not able to take the call at which time I asked her if we could interview her so she could give her set of facts and her version of what is going on to investigators. And we took her into an interview room and we interviewed her.

*Id.* at 27. When asked what Appellant's response was when he asked to interrogate her, Trooper Williams testified "She said no problem. She agreed to be interviewed." *Id.* at 27–28. Trooper Williams read Appellant her *Miranda* rights, after which he and Corporal Thomas McAndrew interviewed Appellant for approximately thirty minutes. *Id.* at 28–32. As the interview progressed to what Trooper Williams described as "harder questions," Appellant "said that is enough. I want a lawyer." *Id.* at 32. At that point, the troopers "stopped all questioning, prepared her to—we discussed among ourselves about transporting her back to the prison. And we took her immediately back." *Id.*

On appeal, Appellant alleges that because she "had attempted to reach counsel and obviously wished to gain counsel's . . . advice," her subsequent statement to Trooper Williams and Corporal McAndrews is inadmissible. Appellant's Brief at 11. We disagree. As outlined above, the *Miranda/Edwards* rule and its progeny

clearly require an unequivocal invocation of an accused's right to counsel. While we find that Appellant's request for an attorney **during** her interview, which triggered its cessation, was valid, unequivocal, and sufficient under *Miranda/Edwards*, we do not find that Appellant's phone call to Attorney Velander **prior** to her interview was a sufficient articulation of her desire to have counsel present for the interview such that her statements require suppression. Thus, we conclude that the trial court did not err in failing to suppress Appellant's statements.

■ Appellant's second and fourth issues are interrelated so we will address them together. In her second issue, Appellant challenges the trial court's admission of "hearsay statements from the decedent that he was scared of [Appellant] and that if he were to end up dead it would be [Appellant's] fault." Appellant's Brief at 9.

■ The trial court admitted the statements based on the state of mind exception to the hearsay rule. See Trial Court Opinion, 11/8/06, at 12–17. Rule 803(3) provides an exception to the preclusion of evidence under the hearsay rule for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain and bodily health." Pa.R.E. 803(3). Generally, out of court statements by homicide victims are admissible when they are relevant to show proof of motive or malice. *Commonwealth v. Luster*, 71 A.3d 1029, 1041 (Pa.Super.2013) (*en banc*) (affirming admission under Pa.R.E. 803(3) of decedent's hearsay statement that decedent was "scared" of defendant, that defendant was "trying to kill" decedent, and that defendant "was going to do something real bad to [decedent]"); *see · also Commonwealth v. Puksar*, 559 Pa. 358, 740 A.2d 219, 225 (1999), cert. denied, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 42 (2000) (victim's statements re-

garding his distrust of defendant and victim's belief that defendant was committing fraud were admissible to prove motive and ill will between victim and defendant). In this case, as in *Luster*, the victim's statements were admissible because they reflect Appellant's ill will and malice toward the victim. *Luster*, *supra*, at 1041; *Puksar*, *supra*, at 225.

■ Consonant with our analysis in *Luster*, we further conclude that even if admitting the victim's hearsay statements was erroneous, such error was harmless because the statements were merely cumulative of other evidence adduced at trial. *Luster*, *supra*, at 1042; *see Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335, 1343 (1995) (internal citation omitted) ("Erroneously admitted evidence that is cumulative of other, untainted evidence is harmless error."). In affirming Appellant's judgment of sentence in a prior appeal, we noted that "[a]t trial, the Commonwealth introduced the testimony of five witnesses, each of whom testified that [Appellant] confessed to murdering [the victim] to them, and in one instance, she bragged about her crime." *Commonwealth v. Kunkle*, 990 A.2d 47 (Pa.Super.2009) (unpublished memorandum) at 2. In finding there was sufficient evidence to support Appellant's convictions, we observed:

[T]he Commonwealth presented evidence that [the victim] was attacked in the basement stairwell by someone waiting for him at the top of the stairs, and was apparently sprayed with pepper spray before he was struck numerous times with a blunt force object. *See* N.T., Trial, 2/9/07, at 619; N.T., Trial, 2/6/07, at 231–232; N.T., Trial, 2/13/07, at 960; .N.T., Trial, 2/7/07, at 175. There was no sign of forced entry into [the victim's] home and entry was made through an unlocked garage door. *See*

N.T., Trial, 2/6/07, at 93–96; N.T., Trial, 2/7/07, at 130. Blood splatter and a large pool of blood surrounded the area where [the victim's] body was found. *See Id.,* at 133–135. There was a boot footprint discovered in the pool of blood, and numerous blood-stained footprints from the same boot going up to the top of the staircase. *See Id.,* at 141–143. Traces of an active ingredient utilized in self-defense sprays were also discovered throughout the scene. *See* N.T., Trial, 2/13/07, at 960.

The Commonwealth also presented multiple witnesses whose testimony implicated [Appellant] as the murderer. [Appellant's] son, Gregory Rowe, testified that [Appellant] told him that she killed [the victim] by spraying him with some type of mace, knocking him down the stairs, and beating him with a baseball bat until he was dead. *See* N.T., Trial, 2/8/07, at 364, 365. Mr. Rowe also stated that [Appellant] had him purchase a can of mace for her two to three weeks before she killed [the victim]. *See Id.,* at 373–374.

William Terlesky, a co-worker of [Appellant's] father, testified that while [Appellant] was sitting in his car one morning she told him also that she killed [the victim] and that she confessed the murder to her boyfriend, Marty Reynolds, as well, but she was afraid Mr. Reynolds was going to turn her in. *See* N.T., Trial, 2/12/07, at 792, 794. The next day, [Appellant] asked Mr. Terlesky to retrieve a pair of boots, a bat, and gloves that she had discarded, and help her burn them. *See Id.,* at 797. With regards to the murder, [Appellant] told Mr. Terlesky that she waited at [the victim's] house until he came home and hit him in the head at the top of stairs. *See Id.,* at 801–802. She also remarked that after she hit him "he went down like a pussy." *Id.*

Mr. Reynolds, a former police officer for the Pocono Mountain Regional Police, and [Appellant's] boyfriend at the time, also testified that [Appellant] confessed to him about the murder. *See* N.T., Trial, 2/9/07, at 717. Mr. Reynolds inquired about the bruises on the left portion of [Appellant's] thigh, and she responded that she and [the victim] "fought all the way down the steps." *Id.,* at 715, 717.

Lastly, April Steinhauser and Nathaniel Evans testified that they were solicited by [Appellant] to kill [the victim] a few months prior to the actual murder, and that she supplied them with his photograph and took them to his residence in order to plan the crime. *See* N.T., Trial, 2/12/07, at 748–749; N.T., Trial, 2/9/07, at 673–677. Both Ms. Steinhauser and Mr. Evans testified that they never had any intention of killing [the victim], but merely wanted to take his money, and, to that end, stole a small safe from his residence. *See Id.,* at 679–680.

*Id.* at 4–7. Given the overwhelming evidence of Appellant's guilt, any perceived error in the admission of the victim's hearsay statements would be harmless.

 Further, we are persuaded by the alternative grounds for admission offered by the trial court in its Pa.R.A.P. 1925(a) opinion. The trial court observed:

[The victim's] statements, if considered hearsay, were likely admissible under Pa.R.E. 804(b)(6) (Forfeiture by Wrongdoing) since [Appellant's] alleged motive in killing the victim was to make the victim unavailable, as a witness and party, in the custody proceedings in which they were involved. *See Com. v. King,* 959 A.2d 405, 413–417 (Pa.Super.Ct.2008) (holding that Pa.R.E. 804(b)(6), in spite of *Crawford* [*v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158

L.Ed.2d 177(2004) ], allowed hearsay statements of murder victim shot to prevent the victim's testimony regarding illegal arms purchases) *citing Giles v. California,* 55 [554] U.S. 353 [128 S.Ct. 2678, 171 L.Ed.2d 488] (2008) (holding similarly for F.R.E. 804(b)(6)).

Trial Court Opinion, 3/1/13, at 5, n. 12. The record supports this basis for admitting the victim's statements.

Attorney Barry Cohen testified that the victim was a longstanding client and friend. N.T., 2/8/07, at 523. Attorney Cohen stated that he "prepared [a] complaint for the purpose of obtaining some shared custody for [the victim] with his child." *Id.* at 524. Attorney Cohen explained that "[a]fter a complaint is filed . . . it is then scheduled for a custody conference . . . held by a master." *Id.* The conference is called a "conciliation conference." *Id.* at 525.

Attorney Cohen testified that at the first conciliation conference Appellant "complained bitterly that she didn't want [the victim] to see the child at all." *Id.* at 526. Attorney Cohen recalled that Appellant introduced pictures of the victim's home during the conference. *Id.* at 527. The pictures showed that the victim's home was "dirty" and "unkempt." *Id.* at 528. Attorney Cohen expressed that "[Appellant] had not wanted any custody [to be given to the victim], which is very drastic . . ." *Id.* Initially, the victim only obtained supervised visitation, which was revisited at a second conciliation conference. *Id.* at 528–529. During the second conciliation conference, Appellant reacted with "great anger" and was "seething" when "the subject of [the victim] having unsupervised visitations came up." *Id.* at 529. Attorney Cohen described Appellant as "a completely out of control parent . . . who had no intention whatsoever . . . of wanting the [victim] involved [with their child] . . . [and was] [o]penly belligerent[,] [and] [a]rrogant."

*Id.* at 531. After the second conciliation conference, an order was entered on September 18, 2001 eliminating the "supervised nature" of the visitation. *Id.* at 532. Following the September 18, 2001 Order, the victim called Attorney Cohen "and asked [Attorney Cohen] to file a petition on his behalf almost immediately for contempt." *Id.* at 535–536. Attorney Cohen never had an "opportunity to file that petition" because the victim "was dead." *Id.* at 536. Thus, as the suppression court correctly noted, the "statements related to [the victim's] fear of [Appellant] are relevant and material" to the issue of Appellant's motive to "prevent [the victim] from gaining custody of their minor child and to get [the victim] out of her life. Any statement by [the victim] prior to his murder that indicated he feared for his safety would be very relevant to the instant situation." Trial Court Opinion, 11/8/06, at 29. Likewise, we find the statements would be admissible under Pa.R.E. 804(b)(6). We thus affirm the trial court's admission of the victim's statements.

In her fourth issue, Appellant contends: During the Commonwealth's case in chief, Attorney Barry Cohen [the victim's former counsel] was called to testify regarding certain statements made by the deceased, as well as to testify regarding statements and actions of [Appellant] during various conciliation conferences held in the Domestic Relations section of the Court of Common Pleas of Monroe County. [ ]

[T]he use of Attorney Cohen's testimony was made in violation of *Local Rule 1915.4–1* of the Court of Common Pleas of Monroe County. That rule reads in part as follows:

2. To facilitate conciliation and to encourage frank, open and meaningful exchanges between the parties and their counsel, statements made by the

parties, children, counsel or the Conciliator **at the conciliation conference** shall not be admissible as evidence in court. The Conciliator shall not be competent to serve as a witness for or against any party nor shall there be any testimony taken at the Conciliation Conference . . .

Appellant's Brief at 19 (emphasis supplied).

■■■ Initially, we note that Appellant only dedicated one full paragraph to this issue, without citing a single case in support of her argument. Despite this local rule's application being a matter of first impression, it was still incumbent upon Appellant to develop, substantiate, and support her argument. Appellant's failure to do so results in waiver of her issue regarding the application of Monroe County's exclusionary rule. *See Giant Food Stores, LLC v. THF Silver Spring Development, L.P.*, 959 A.2d 438, 444 (Pa.Super.2008) ("Appellant's issue on appeal is waived because [Appellant] has failed to set forth in its appellate brief any citation to legal authority pertaining to [Appellant's] argument"); *see also Korn v. Epstein*, 727 A.2d 1130, 1135 (Pa.Super.1999) ("arguments not *appropriately* developed are waived") (emphasis in original) (internal citations omitted).

■■■ Waiver notwithstanding, Appellant's claim of confidentiality based on Monroe County Local Rule 1915.4–1 is without merit.

[A]ll statutory interpretation . . . is a pure question of law. Accordingly, our standard of review is *de novo* and our scope is plenary. *St. Elizabeth's Child Care Center v. Department of Public Welfare*, 600 Pa. 131, 963 A.2d 1274, 1276 (2009). The object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly, giving effect, if possible, to all provisions of the statute. 1 Pa.C.S.

§ 1921(a). In general, the best indication of legislative intent is the plain language of a statute. *Malt Beverages Distributors Ass'n v. Pennsylvania Liquor Control Board*, 601 Pa. 449, 974 A.2d 1144, 1149 (2009). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Words of the statute are to be construed according to their "common and approved usage; but technical words and phrases and such others as have acquired a peculiar and appropriate meaning . . . shall be construed according to such peculiar and appropriate meaning. . . ." 1 Pa.C.S. § 1903(a).

*Focht v. Focht*, 613 Pa. 48, 32 A.3d 668, 670 (2011).

Here, Rule 1915.4–1 references statements made "at the conciliation conference." Attorney Cohen did not testify that the victim's statements concerning his fears of Appellant were made at the conciliation conference. Rather, Attorney Cohen testified that "**after** the September 18, 2001 order was entered," the victim "express[ed] . . . fear he had of [Appellant][.]" N.T, 2/8/07, at 537 (emphasis supplied). Attorney Cohen "recall[ed] very specifically [that] on two or three different occasions [the victim] said if I am found dead she—meaning [Appellant]—will have done it." *Id.* Attorney Cohen expressed that "[the victim] was scared to death . . . [the victim] thought that if he filed [the contempt petition], it would escalate the situation . . . make it worse . . . [and the victim] repeat[ed] . . . during every conversation that I am dead. I am going to be dead. And she is going to do it." *Id.* at 552. Attorney Cohen clarified that the victim "**did not say [Appellant] said this to me. [The victim] merely shared with me his feeling about . . . the circumstances that he was involved in that moment.**" *Id.*

(emphasis supplied). Attorney Cohen's testimony shows that the victim's statements concerning his fear of Appellant were contemporaneous to the preparation of the contempt petition, a pleading which was drafted *following* the conciliation conference, such that the victim's statements as set forth by Attorney Cohen fall outside of the exclusionary rule's ambit, and accordingly are not subject to same.

█ In addition, we do not find that Rule 1915.4–1 would exclude Attorney Cohen's statements regarding Appellant's behavior at the conciliation conferences nor concerning Appellant's introduction during the proceedings of pictures of the victim's home. Although there are no cases directly on point regarding the confidentiality of conciliation conferences under Rule 1915.4–1, we find guidance in the rules applicable to mediations because such proceedings are analogous for purposes of our analysis. Mediations are defined as "[t]he deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute." 42 Pa.C.S.A. § 5949(c). Attorney Cohen similarly described conciliation conferences as a process "used to try and resolve disputes, meaning you are there with attorneys; you are there with the parties and every effort is made to work [the custody issues] out." N.T., 2/8/07, at 525.

The confidential nature of mediation communications are set forth as follows:

§ 5949. **Confidential mediation communications and documents**

(a) **General rule.**—Except as provided in subsection (b), all mediation communications and mediation documents are privileged. Disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. Mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration action or proceeding.

42 Pa.C.S.A. § 5949(a). While communications or conduct relative to mediations are privileged, the communications may be subject to disclosure in a criminal prosecution "to the extent that the communications or conduct is relevant in a criminal matter[.]" 42 Pa.C.S.A. § 5949(b)(2). Here, the testimony that Attorney Cohen gave regarding Appellant's anger and refusal to share child custody is relevant to the criminal prosecution in the victim's death because the testimony is germane to Appellant's motivation and ill will toward the victim. Accordingly, we find no error in its admission.

Further, mediation rules provide that "any document which otherwise exists, or existed independent of the mediation and is not otherwise covered by [§ 5949], is not subject to this privilege if they existed independently of the mediation." 42 Pa. C.S.A. § 5949(b)(4). In this case, Attorney Cohen's testimony of the pictures that Appellant produced of the victim's home reflects materials in existence independent of the conciliation conference, which we find are not subject to the confidentiality privilege. Additionally, Attorney Cohen's reference to these pictures is cumulative to Gregory Rowe's testimony, received without objection, that Appellant "went into [the victim's] house when [the victim] was not there and ... took pictures of the conditions of his house for the custody thing they were going through." N.T., 2/8/07, at 357.

█ Appellant further contends that "presenting the testimony of the hearsay statements of [the victim] through various witnesses at trial violated [Appellant's] rights to confront and cross[-]examine her accuser" as set forth under the Sixth Amendment of the United States Constitu-

tion and under Article One, Section 9 of the Pennsylvania Constitution. Appellant's Brief at 13–15. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. Article One, Section 9 of the Pennsylvania Constitution provides the same protection.

■ In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court explained that non-testimonial statements were not subject to a Sixth Amendment analysis provided they were otherwise admissible under the applicable state's hearsay rule. Specifically, the *Crawford* Court explained:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v.*] *Roberts* [448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.

*Crawford*, 541 U.S. at 58, 124 S.Ct. 1354. As more fully discussed above, the victim's statements in this case were properly admitted under the state of mind exception to the hearsay rule, and would have been properly admitted under the forfeiture by wrongdoing exception set forth under Pa. R.E. 804(b)(6). Further, we agree with the trial court that "the victim's statements to his friends and confidants were made in a casual setting and were non-testimonial in nature ... [and] ... [t]hus, the limits of *Crawford* do not apply." Trial Court Opinion, 3/1/13, at 5; *see Commonwealth v. Jackson*, 457 Pa. 237, 324 A.2d 350, 355 (1974) (reiterating that the right of a defendant as afforded under Article I, section 9 of the Pennsylvania Constitution and the Sixth Amendment of the United States Constitution "though fundamental, is not an absolute right ...").

In her third issue, Appellant challenges the trial court's denial of her motion to sever the criminal solicitation and the criminal homicide charges. We have explained:

> In reviewing a trial court decision to consolidate or to sever offenses for trial, our standard is abuse of discretion. *Commonwealth v. Collins*, 550 Pa. 46, 54, 703 A.2d 418, 422 (1997), *cert. denied*, 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998). Offenses charged in separate informations may be tried together if they are "based on the same act or transaction" or if "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion." Pa. R.Crim.Pro. 582(A)(1). The court has discretion to order separate trials if "it appears that any party may be prejudiced" by consolidating the charges. Pa. R.Crim.Pro. 583.

> Our Supreme Court has established a three part test, incorporating these two rules for deciding the issue of joinder versus severance of offenses from different informations. The court must determine whether the evidence of each of the offenses would be admissible in a separate trial for the other; whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, whether the defendant will be unduly prejudiced by the consolidation of offenses. *Commonwealth v. Lark*, 518 Pa. 290, 302, 543 A.2d 491, 497 (1988) (quoted in *Collins, supra* at 55, 703 A.2d at 422).

*Commonwealth v. Thomas*, 879 A.2d 246 (Pa.Super.2005)

In denying Appellant's motion to sever, the trial court reasoned:

[Appellant] asserts that the solicitation to commit criminal homicide offense should be severed from the offense of criminal homicide because evidence of the solicitation would not be admissible in the homicide trial. Previously, in the prior solicitation to commit homicide case, [Appellant] sought to have evidence of [the victim's] homicide and conversations between [Appellant] and Ms. Steinhauser excluded from evidence. The Commonwealth appealed this court's ruling in that case and the Pennsylvania Superior Court held that the "evidence relating to the homicide is relevant to this prosecution" (referring to the prior solicitation charge). (Com.'s Exhibit No. 3, 5/17/06; Pa. Superior Court Memorandum Opinion, 8/9/05, p. 9 re: *Com. v. Kunkle,* No. 943 CR 2003 (Monroe County)). The Court further stated that "[T]he fact that the target of the alleged solicitation actually was murdered makes the existence of the solicitation more probable than not." [Com.'s Exhibit No. 3, 5/17/06, Memorandum, p. 9.] Likewise, the opposite would be true here: all evidence relating to the charge of solicitation to commit murder is relevant to the homicide prosecution.

In reaching its decision on the admissibility of evidence in the solicitation case, the Superior Court referred to the case of *Com. v. Spotz* [562 Pa. 498], 756 A.2d 1139 (Pa.2000), wherein the Pennsylvania Supreme Court held:

... **In addition, evidence of other crimes may be introduced where such evidence was part of the chain or sequence of events which became part of the history of the case in question and formed part of the natural development of the facts.** *Com. v. Kunkle,* No. 2494 EDA 2004, Memorandum 8/9/05, p. 11, *citing* Spotz

[*Spotz* ], 756 A.2d at 1152 (emphasis in original).

The Supreme Court in *Spotz* held that "evidence of the other murders was part of the chain or sequence of events at issue and part of the natural development of the case." *Kunkle, supra.* at p. 12. Similarly, evidence of the alleged solicitation plot to kill [the victim] is part of the chain or sequence of events leading to the death of [the victim] and is part of the natural development of this case. Furthermore, since the Superior Court reasoned that the evidence of the solicitation to commit murder charge is relevant to the homicide charge, it stands to reason that the charges are part of the same incident or criminal episode. Thus, it is illogical and not judicially economic to sever the offenses.

Trial Court Opinion, 11/8/06, at 33–35. Agreeing with the trial court's rationale and finding no abuse of discretion, we affirm the trial court's determination that the criminal solicitation and criminal homicide charges should not be severed. *See Commonwealth v. Page,* 59 A.3d 1118, 1133 (Pa.Super.2013) (affirming trial court's denial of motion to sever because not severing the offenses helped "to tell the story of what happened to Victim ... as well as establish ·Appellant's motive").

In her fifth and final issue, Appellant contends that the trial court erred when it precluded Appellant from impeaching Commonwealth witness Gerald Terlesky with his criminal history. *See* Appellant's Brief at 20–21. We find that based on our review of the record, Appellant has waived this issue. Appellant did not set forth in writing, as required by Pa.R.E. 609, that she would seek to impeach the Commonwealth witness with his past convictions. Appellant's post-trial motions referenced this topic only generally. *See generally* Appellant's Post Sentence Motions, 7/2/07.

Appellant only devoted 10 lines of discussion to this issue in her brief, and has failed to develop the issue in any substantial fashion, citing only the applicable standard of review. Accordingly, we find Appellant has waived this issue and decline to reach it. *See Giant Food Stores, LLC,* 959 A.2d at 444; *see also Korn v. Epstein,* 727 A.2d at 1135.

Judgment of sentence affirmed.

Judge COLVILLE concurs in the result.