J-S03045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW DYLAN CROTHERS | : | |
| | : | No. 266 EDA 2017 |
| Appellant | | |

Appeal from the Judgment of Sentence December 5, 2016
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0000106-2016

BEFORE:   BENDER, P.J.E., PANELLA, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED FEBRUARY 28, 2018**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Monroe County following Appellant Matthew Dylan Crothers' conviction by a jury on the charge of voluntary manslaughter, 18 Pa.C.S.A. § 2503(b).  Appellant presents seven issues for our review.  After a careful review, we affirm.

The relevant facts and procedural history are as follows: The Commonwealth charged eighteen-year-old Appellant with a single count of criminal homicide, 18 Pa.C.S.A. § 2503(b), in connection with the stabbing death of his nineteen-year-old brother.[1]  On May 2, 2016, Appellant filed a

---

[1] The Commonwealth also charged Appellant with a single count of possessing an instrument of crime, 18 Pa.C.S.A. § 907; however, the Commonwealth subsequently withdrew the charge.

---

*   Former Justice specially assigned to the Superior Court.

counseled pre-trial motion seeking to suppress the statements he made to police. Specifically, Appellant contended that, despite his request to speak to an attorney during the police's questioning of him on June 9, 2014, the troopers continued the custodial interrogation in violation of his constitutional rights. By order and opinion filed on June 15, 2016, the trial court denied Appellant's motion to suppress.

Represented by counsel, Appellant proceeded to a jury trial at which the Commonwealth presented the testimony of numerous witnesses. Specifically, Trisha Moore testified she lived next door to Appellant's family, and on June 9, 2014, at approximately 6:00 a.m., Appellant's fifteen-year-old sister, August Crothers ("August"), appeared at her front door, screaming for someone to call 911. N.T., 9/8/16, at 81. Ms. Moore opened her front door, and August said, "My brothers were in a fight." *Id.* Appellant was standing behind August and holding his hand, which was bleeding. *Id.* 81-82. Ms. Moore noticed that Appellant, who was shirtless, had scratches on his back and two deep bite marks on his shoulder/arm. *Id.* at 91. Ms. Moore called 911 at 6:30 a.m. seeking an ambulance for Appellant, and she told August to go to school to take her final examinations. *Id.* at 88.

Thereafter, Ms. Moore sat with Appellant a few minutes and suddenly realized that the other brother, David ("the victim"), was in the Crothers' house injured. *Id.* at 84. Ms. Moore immediately ran over to the Crothers' home, where the victim's girlfriend greeted her. *Id.* Inside, she discovered

the victim lying next to a staircase with his mother holding a tourniquet around his leg. *Id.* at 85. The victim's eyes were open, but he was not responsive; his mother was frantic and covered in the victim's blood. *Id.* Ms. Moore made a second call to 911 at 6:40 a.m. and requested an ambulance for the victim. *Id.* at 87. Ms. Moore made a third call to 911 at 6:45 a.m., and the police arrived on the scene at 6:47 a.m.

Pennsylvania State Police Trooper Christopher Tomlinson was the first officer to arrive at the scene. N.T., 9/9/16, at 44. He testified that, upon his arrival, Appellant was sitting in a chair in the driveway, and Mrs. Crothers informed him that her other son, the victim, was in the house and had been stabbed. *Id.* at 45. He asked her who stabbed him, and she pointed to Appellant saying, "My other son, Matt." *Id.* Trooper Tomlinson approached Appellant, noticed that he was bleeding, and asked him if he was "okay." *Id.* Appellant stated that his brother was bleeding. *Id.* He also said, "He hurt my sister. We got into a fight, and we rolled around on a knife. I didn't mean to hurt him. He landed on the knife." *Id.* Trooper Tomlinson handcuffed Appellant, and when emergency technicians arrived, he followed them inside, observing that the victim had wounds to his leg. *Id.* at 46-47. He found blood in the hallway by the bottom of the staircase, as well as a blue-handled knife and blood in a downstairs bedroom. *Id.* at 52.

Trooper Tomlinson travelled to the school to speak to August. *Id.* at 58. The trooper noticed no injuries, blood, or bruises on August; however,

she had clearly been crying. *Id.* As Trooper Tomlinson transported August to the police barracks, she told the trooper "her brothers got in an argument over the victim's girlfriend, Christina Collins, being at the house. And there was an issue with them believing she was bringing drugs into the house." *Id.* at 59. August indicated the victim and Appellant "had gotten into a physical fight [and] [a]t one point. . .[the victim] had threatened to hit her." *Id.* However, she did not indicate that the victim had, in fact, hit her. *Id.*

Loren Parker, an emergency medical technician, testified she responded to the scene and found the victim in a "life-threatening-condition" due to severe blood loss from lacerations and a puncture wound to his right leg. *Id.* at 16-17. The victim remained unconscious throughout his treatment by Ms. Parker, and he went into cardiac arrest several times. *Id.* at 26-27. The emergency crew arrived at the Pocono Medical Center with the victim at 7:43 a.m. *Id.* at 30.

David Scaff, M.D., testified that he is a trauma surgeon at Pocono Medical Center, and he treated the victim in the emergency room. He testified the victim suffered three stab wounds: a puncture wound to the mid-portion of the inside of his right thigh, a large laceration just below the inside of his right knee, and a large laceration just above the inside of his right knee. N.T., 9/8/16, at 116-18. By the time the victim was brought into the emergency room, he had been receiving CPR for thirty-five minutes. *Id.* at 108. He opined that the victim sustained a "massive injury" and lost "almost all of his

blood volume." *Id.* at 105. Thus, the victim had very little "blood in him to circulate[,]" and he was non-responsive, resulting in Dr. Scaff giving the victim large volumes of blood. *Id.* Dr. Scaff, as well as a vascular surgeon, operated on the victim and repaired his femoral artery, which had been severed; however, following the surgery, the victim remained critically ill, and ultimately, on June 13, 2014, he died from his injuries. *Id.* at 130-47.

Robert Allen, the Monroe County coroner, testified he issued a death certificate for the victim with the cause of death listed as "[s]harp force injuries to the right lower extremity[,]" and the manner of death as "[h]omicide." N.T., 9/9/16, at 74.

David Wyke, DMD, who is a general dentist and forensic dentist, testified he graduated from the Temple Dental School in 1998, worked with a forensic dentist, and received specialized training in forensic dentistry in 1999. *Id.* at 85-86. He testified the police asked him to make dental impressions of the victim, and he did so on June 16, 2014. *Id.* at 95. Dr. Wyke indicated the procedure he used to make the dental impressions was "the normal dental process" and a scientifically accepted procedure. *Id.* at 90. After he took the impressions, he casted them and then compared them to photographs of bite marks, which were on Appellant's left arm. *Id.* at 94-105. Dr. Wyke opined the bite marks on Appellant's left arm were consistent with the impressions he made of the victim's teeth. *Id.* at 105.

Trooper David Andreuzzi testified he took photographs of the people present at the Crothers' home on the day of the incident. Neither the victim's girlfriend, the victim's mother, nor the victim's sister had any visible signs of injury, although the victim's mother's leg was covered in someone else's blood. *Id.* at 129-137. Appellant had an injury to his right hand, as well as an injury to his arm, which Appellant indicated was a bite mark. *Id.* at 138-39. He also had blood on his pants and shoes. *Id.* at 140. Trooper Andreuzzi saw no visible sign of injury to Appellant's head or back. *Id.* at 142-44. Trooper Andreuzzi also photographed the Crothers' home, noting the absence of any indication of a struggle. *Id.* at 156-57. The trooper testified items were not "knocked over" and there was no indication of a "knockdown, drag-out fight[.]" *Id.* at 158. There was a large pool of blood near the staircase and blood in Appellant's room, as well as a knife. *Id.* at 157-61. Based on his observation, Trooper Andreuzzi opined the following:

> [T]he entire event occurred within a 3-foot by 6 foot section, which is the hallway itself. I was advised that this was a violent physical altercation. In that little, tiny 3-foot section there's no evidence of that type of altercation where there was a physical knockdown, drag-out altercation. Because if that was the case, there would have been a lot more of a stir in that area, damage to the walls, items knocked down or toppled over. There wasn't any of that.

*Id.* at 166. Trooper Andreuzzi noted that he found marijuana and a marijuana pipe in the victim's bedroom; however, he found no such items in Appellant's bedroom. *Id.* at 168-69.

Trooper Eric Porpiglia testified he interviewed Appellant at the police station, and the interview was recorded. N.T., 9/9/16, at 189-90. The audio of the interview was played in open court for the jury. *Id.*

Wayne Kenneth Ross, MD, a forensic pathologist, testified he prepared a report based on the evidence in this case. N.T., 9/12/16, at 12-14. Dr. Ross confirmed the victim's cause of death was "sharp force injuries to right lower extremity." *Id.* at 15. He testified, to a reasonable degree of medical certainty, that the victim was "stabbed and cut three times to his right lower extremity[,]" he had "total blood loss at the scene[,]" and he went "into shock and die[d]." *Id.* at 18-19. He testified the type of cuts at issue would have "spurted out" blood and be "visible to persons who have witnessed the event[.]" *Id.* at 22. Based on his examination of the wounds, Dr. Ross opined they were "methodical and controlled. They're not random. They're not accidental. They're purposeful and they're very specifically lined up with one another and there's three distinct motions that had occurred." *Id.* at 31-32. He indicated the victim's wounds were "well controlled or thrust deeply or thrust long and all line up together, which inferentially in looking at the science here says there's three distinct well-defined motions that occurred." *Id.* at 32.

Dr. Ross testified the victim's injuries to his leg were consistent with defensive wounds, as well as being attacked from behind. *Id.* at 42. He noted the victim would have been "surprised" as there were no defensive wounds to

his palms. *Id.* He opined the Appellant's hand wound was an "offensive sort of wound" resulting from his hand slipping on the knife during the attack. *Id.* at 44. Dr. Ross noted there was no sign of injury on Appellant consistent with him being punched, hit, or kicked. *Id.* at 45-46. He noted the absence of such injury was "consistent with [his] conclusion that the attack came from behind the victim[.]" *Id.* at 46. He also noted there was no obvious sign of a struggle at the Crothers' house and the attacked was confined to a small area (the hallway). *Id.* at 47-49.

Dr. Ross testified the bite marks on Appellant's arm were consistent with him attacking the victim from behind. *Id.* at 51. In this regard, he noted "[Appellant] would have been behind [the victim], and the left forearm would be up obviously near the face, near the jaw, near the mouth itself, and the bite. . .[would be on] the arm." *Id.*

The defense called Isidore Mihalakis, MD, a forensic pathologist, who agreed the victim died as a result of a stab wound of the leg at the hands of another. *Id.* at 81. However, he disagreed that "the person deliberately stabbed the area knowing what he was doing." *Id.* at 82. He testified that in "nearly 50 years of practice, this is the first one that I've seen where a stab wound of the leg is the single cause for someone's death." *Id.* at 86. He opined the victim's leg wounds occurred in close proximity in time. *Id.* at 89. Dr. Mihalakis noted that, if Appellant intended to kill the victim, there would have been more obvious places to stab him, including the chest or abdomen.

*Id.* at 90. He testified that, if the stabbing had been to the outside of the victim's thigh, it would not necessarily have been fatal. *Id.* Upon cross-examination, he agreed the victim was unarmed. *Id.* at 99.

August Crothers testified that, at around 6:15 a.m., she heard her brothers arguing so she went downstairs. *Id.* at 106. Appellant was standing outside of the victim's bedroom, and the victim was lying on his bed with his girlfriend. *Id.* at 107. Appellant and the victim were arguing over whether the girlfriend should leave the home. *Id.* August took Appellant's side during the argument, resulting in the victim charging at her, pushing her against a window, and grabbing her neck. *Id.* at 109. August ran for the stairs, but the victim followed, pushing her onto her back and not letting her stand up. *Id.* at 110. The victim "was just screaming in [her] face and screaming and screaming at [her] [ ] close to her face, and [she] started punching his chest because [she] just couldn't get him off [her]." *Id.*

August testified that, at this point, Appellant grabbed the back of the victim's legs to pull him off August, and she ran upstairs. *Id.* at 110-11. Her brothers continued to argue, and the victim taunted Appellant. *Id.* at 111. August testified the victim attacked Appellant in the hallway, and their mother tried to split them up. *Id.* at 112. The two brothers fell on the floor, with the victim on top of Appellant. *Id.* The brothers wrestled while the mother tried to separate them and then the victim screamed that he had been stabbed. *Id.* at 113. August denied seeing the stabbing or a knife. *Id.* She confirmed

that she ran to the neighbor's house and, eventually, went to school. *Id.* She testified that, immediately after the incident, Appellant was crying, "freaking out[,]" and indicated "he didn't know what he did." *Id.* at 117.

Gabrielle Crothers, who is Appellant's and the victim's mother, testified she heard her sons yelling, and she ran to investigate. *Id.* at 140-41. She indicated Appellant was yelling at the victim's girlfriend to leave and the victim became very angry. *Id.* at 141. The victim grabbed Appellant, picked the family dog up by the throat, and became violent towards August. *Id.* at 142. The victim pushed August towards a window and, as August tried to run up the stairs, the victim followed, pinning her on her back. *Id.* at 143. Mrs. Crothers testified the victim "was berserk. He was a total lunatic." *Id.* Appellant tried to help his sister and pulled the victim off her. *Id.*

Mrs. Crothers testified the victim "became even more enraged[,]" and Appellant tried to run into his room; however, the victim tackled him in the hallway. *Id.* at 143-44. Appellant was "on the bottom" and the victim bit him. *Id.* at 144. Mrs. Crothers testified she separated her sons and then left the room. *Id.* When she came back in, Appellant was holding the knife down to his side and told the victim he was going to call the police, which further enraged the victim, who indicated he would "kill" Appellant. *Id.* at 145-47. She testified the victim dove on top of Appellant and began punching him in the head, at which point Appellant stabbed the victim. *Id.* at 145. The victim

stood up, indicating he had been stabbed. *Id.* at 146. Mrs. Crothers attempted to stop the bleeding, but she was unable to do so. *Id.*

The Commonwealth presented a rebuttal witness, Trooper Jesse D. Bachman, who testified she interviewed August after the incident. She indicated August relayed that her brothers were arguing, and the victim pushed her against the wall and then pushed her down on the stairs. N.T., 9/13/16, at 7. She denied that August indicated the victim had struck her. *Id.* at 9. August told the trooper that her brothers began to wrestle with their mother trying to separate them. *Id.* at 7. She indicated that, as they were wrestling, Appellant stabbed the victim and Appellant "crawled out from under [the victim.]" *Id.* at 8.

At the conclusion of the trial, the jury convicted Appellant of the offense indicated *supra*, and on December 5, 2016, the trial court sentenced Appellant to seventy-two months to one hundred and eighty months in prison. Appellant filed a timely post-sentence motion, which the trial court denied, and this timely appeal followed. All Pa.R.A.P. 1925(b) requirements have been met.

Appellant presents the following issues for our review, which we set forth verbatim:

1. Did the Court abuse its discretion and commit reversible error when the court did not allow the charge of involuntary manslaughter to go to the jury because involuntary manslaughter is a lesser included offense of murder, and because the evidence would support an involuntary manslaughter verdict whenever it would support a murder or voluntary manslaughter verdict?

2. Did the Court abuse its discretion by not suppressing Appellant's interview with state police when he asks for an attorney and the interview was not stopped?

3. Did the Court abuse its discretion by allowing Dr. David Wyke to testify as an expert in forensic odontology or dentistry?

4. Did the Court abuse its discretion by allowing Dr. David Wyke to testify where his method was not shown to be generally accepted in the scientific community?

5. Did the Court abuse its discretion by sentencing Appellant to not less than 72 months nor more than 180 months where mitigating factors outweighed the aggravating factors?

6. Did the Court abuse its discretion by not setting aside the verdict of Voluntary Manslaughter because it was against the weight of the evidence?

7. Did the Court abuse its discretion by not setting aside the verdict of Voluntary Manslaughter because it was against the sufficiency of the evidence?

Appellant's Brief at 5-6.

In his first issue, Appellant contends the trial court erred in failing to give the involuntary manslaughter jury instruction. We find this issue to be waived.

Pennsylvania Rule of Criminal Procedure 647 provides that "[n]o portions of the charge nor omissions from the charge may be assigned as error unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(C). Moreover, our Supreme Court has held "the mere submission and subsequent denial of proposed points for charge that are inconsistent with or omitted from the instructions actually given will not suffice to preserve an issue, absent a specific objection or exception to

the charge." ***Commonwealth v. Pressley***, 584 Pa. 624, 887 A.2d 220, 225 (2005).

Here, with regard to Appellant's proposed jury instruction on involuntary manslaughter, the record reveals the following exchange:

[DEFENSE COUNSEL]: But also then for the record, you were denying adding the involuntary?

THE COURT: Yes. And we're going to get to that.

[DEFENSE COUNSEL]: Okay.

\*\*\*

THE COURT: So, I know that, [defense counsel], you have something?

[DEFENSE COUNSEL]: Yes. Yesterday you also asked for the inclusion of involuntary manslaughter and you asked for case law, and I did send a couple of things that we were able to find.

THE COURT: Yes.

[DEFENSE COUNSEL]: And then when I did approach before doing closings today and I asked if it was going to be included, you said no. So I just wanted to make sure that it was on the record that it was requested and denied.

THE COURT: And you accept that ruling?

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: Yes.

THE COURT: And so that was requested and it is denied. I don't really—I don't see it in the case as that. I know you were using the term accident. Maybe you were using it in a different way that there was not an intent to kill. But that the stabbing itself—I don't see the fact of the stabbing itself being an accident in the case.

N.T., 9/13/16, at 102-04.

Here, although Appellant included in his points for charge an instruction on involuntary manslaughter, the trial court declined to give the instruction, indicating that it didn't "see it in the case[.]" ***Id.*** at 104. Defense counsel did

- 13 -

not object to the trial court's ruling; but rather, he indicated he accepted the ruling. *Id.* Thereafter, defense counsel did not object to the trial court's instruction as given, and in fact, he indicated that he had nothing to add to the charge. *Id.* at 147. Further, after the jury requested a supplemental charge on the elements of homicide, and the trial court again did not instruct on involuntary manslaughter, defense counsel indicated he was satisfied. *Id.* at 167. Thus, Appellant's claim is waived. **See Pressley**, **supra**.

In his second issue, Appellant contends the suppression court erred in failing to suppress Appellant's interview with the Pennsylvania State Police. Specifically, Appellant contends that, in the course of custodial interrogation, Troopers Eric Porpiglia and Bruce Wesnak violated his constitutional rights when they failed to halt the interrogation after Appellant indicated he wanted to speak to an attorney. Consequently, Appellant argues his statements made during the interrogation should have been suppressed.[2]

Initially, we note that we review the denial of a motion to suppress as follows:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining

---

[2] We note that in ruling on Appellant's suppression motion the trial court relied upon two Commonwealth exhibits: an audio recording of Appellant's June 9, 2014, interview, as well as a transcription of the interview. Although Appellant attached a copy of the transcription to his brief as a reproduced record, neither the audio recording nor the transcription were included in the certified record. In any event, the trial court provided in its opinion extensive excerpts from the exhibits, and the parties do not challenge the accuracy of the trial court's excerpts. Accordingly, we shall continue to review the merits of Appellant's suppression claim.

whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record[.] Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa.Super. 2015)

(citations, alterations, and ellipsis omitted).

[R]elevant to our inquiry is the body of law concerning a defendant's invocation of his constitutional rights while in custody. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation, so as to ensure that the defendant's right against compulsory self-incrimination is protected. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the High Court revisited its holding in *Miranda* and adopted a prophylactic rule that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880. The High Court explained that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." *Id.* at 484–85, 101 S.Ct. 1880 (emphasis added). The purpose behind this rule is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan*

*v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

       The U.S. Supreme Court has held that in order "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether the right to counsel was invoked by the accused is an "objective inquiry." ***Davis v. United States***, 512 U.S. 452, 458–59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Effective assertion of the Fifth Amendment right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." ***McNeil v. Wisconsin***, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis omitted); ***see also Commonwealth v. Fears***, 575 Pa. 281, 836 A.2d 52, 61 (2003) (quoting ***McNeil***). However, if the accused makes an *ambiguous or equivocal reference* that would lead an officer, in light of the circumstances, to believe "only that the suspect *might* be invoking the right to counsel," police interrogation *need not cease. **Davis***, 512 U.S. at 459, 114 S.Ct. 2350 (emphasis in original). The accused must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." ***Id.***

***Martin***, 627 Pa. at, 655-57, 101 A.3d at 725-26.

In the present case, the suppression court initially concluded, and the parties do not dispute, the following:

There is no dispute that [Appellant] was in custody when he spoke with police on June 9, 2014. There is also no dispute that this interaction with the police was an interrogation for the purposes of ***Miranda***. Furthermore, the police clearly advised [Appellant] of his ***Miranda*** warnings. Finally, [Appellant] does not [ ] challenge his initial waiver as unknowing or involuntary. ***See*** [Appellant's] Brief [in support of suppression], p. 2 ("Although [Appellant] was read his ***Miranda*** Rights and signed a waiver, he can still invoke his rights at any time during the interrogation."). The only issues that have been presented are whether [Appellant] subsequently invoked his right to an attorney and, if so, whether continued questioning by police violated his constitutional rights.

Suppression Court Opinion, filed 6/15/16, at 2-3 (citations to exhibits omitted).

Ultimately, the suppression court concluded that Appellant did not clearly, unambiguously, or unequivocally invoke his right to counsel during the interrogation. *See id.* at 4-10. We have carefully reviewed the suppression court's opinion and conclude the suppression court judge, the Honorable President Judge Margherita Patti-Worthington, has thoroughly and correctly analyzed Appellant's suppression issue. *See id.* Thus, we rely upon the well-reasoned suppression court's opinion for purposes of this appeal.

In his third issue, Appellant contends the trial court abused its discretion in allowing Dr. David Wyke to testify as an expert in forensic odontology or dentistry. We find this issue to be waived.

Appellant's entire appellate argument with regard to this issue is as follows:

> Dr. David Wyke testified to his background in dentistry and forensic dentistry. While is [*sic*] experience and training in those areas sound extensive, that training was a one-week course in 1999. (Notes of Testimony, September 9, 2016, p. 88). The doctor has also never previously testified in court. Additionally, he had only worked on three actual bite mark cases, and one (1) of those was after his evaluation of the case at bar. (*Id.* at 89)[.] So while there appears to be qualifications, these qualifications are not practical as he only has worked on one (1) bite mark case prior to the present case. Dr. Wyke never examined the body of Appellant to see the actual bite marks, instead he relied on photographs.
> Q. Okay. Did you ever examine the bite victim?
> A. No, I was not ever even accessed to those bites themselves. (*Id.* at 107)[.]

Dr. Wyke should not have been determined to be an expert with regards to his testimony on bite mark evidence in that is [*sic*] experience was only one (1) prior case involving bite mark identification prior to the case at bar.

Appellant's Brief at 20.

Appellant has waived this issue on appeal for failing to develop a meaningful legal argument. ***See Commonwealth v. Johnson***, 604 Pa. 176, 985 A.2d 915, 924 (2009) (reiterating that "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived") (citations omitted)); Pa.R.A.P. 2119(a) (requiring that each point treated in an argument must be "followed by such discussion and citation of authorities as are deemed pertinent"). Moreover, our Supreme Court has long held that it is not the appellate court's obligation to formulate an appellant's arguments. ***See Commonwealth v. Williams***, 557 Pa. 207, 223, 732 A.2d 1167, 1175 (1999) (noting that relief is unavailable based upon undeveloped claims for which insufficient arguments are presented on appeal). Accordingly, we decline to address Appellant's undeveloped claim further.

In his fourth issue, Appellant contends the trial court erred in permitting Dr. Wyke to testify to a method that has not been shown to be generally accepted in the scientific community. Specifically, Appellant contends "[t]he analysis of bite [ ] marks has not been accepted by the relevant scientific community[,]" and, therefore, the trial court erred in permitting Dr. Wyke to

opine the bite marks to Appellant's arm were made by the victim. ***See***

Appellant's Brief at 21. We find this issue to be waived.

In its Rule 1925(a) opinion, the trial court relevantly indicated the

following:

> Appellant next argues it was error for the Court to allow Dr. Wyke to testify where his method was not shown to be generally accepted in the scientific community. We do not, however, believe Appellant properly preserved this issue for appeal. At trial, defense counsel made an ambiguous objection to Dr. Wyke. N.T., 9/9/16, [at] 91. After clarification by the Court, defense counsel explained his objection as follows: "While I had the report, I did not have a copy of the CV until today. And taking his testimony prior to this case-it was six or seven years before-it doesn't seem what he is needed for here today is an expert as he is in identification. I think for bit marks he's not an expert." N.T., 9/9/16, [at] 92. The law remains that, in general, an [a]ppellant who fails to objet timely and specifically before or at trial cannot preserve the issue for appellate review by including the issue in a Pa.R.A.P. 1925(b) statement of matters complained of on appeal. ***Commonwealth v. Melendez-Rodriguez***, 856 A.2d 1278, 1287-89 (Pa.Super. 2004) (*en banc*); ***Glenbrook Leasing Co. V. Beausang***, 839 A.2d 437, 444 (Pa.Super. 2003) ("'A party cannot rectify the failure to preserve an issue by proffering it in response to a [Pa.R.A.P. 1925(b)] order.' A [Pa.R.A.P. 1925(b)] statement of matters complained of on appeal is not a vehicle in which issues not previously asserted may be raised for the first time. It is, instead, the vehicle by which an appellant advises the trial court of the *previously preserved* issues that the appellant will advance on appeal so that the trial court may determine if it needs to write an opinion and to direct the trial court to the issues for which an opinion is needed.'") ([quotation omitted])).

Trial Court Opinion, filed 3/24/17, at 8-9.

We have reviewed the relevant notes of testimony and agree with the

trial court's waiver analysis. ***See*** Pa.R.A.P. 302(a) (providing that issues

which were not raised before the trial court are waived and may not be raised

for the first time on appeal); *Melendez-Rodriguez*, *supra* (indicating an appellant may not avoid waiver by raising claim for first time in Rule 1925(b) statement).[3]

In his fifth issue, Appellant presents a challenge to the discretionary aspects of his sentence. In this regard, Appellant acknowledges that he received a standard range sentence, but argues the trial court did not adequately consider the mitigating factors, including his abusive childhood, his childhood relocation to Florida against his will, and his major depressive disorder. *See* Appellant's Brief at 26-27.

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *Commonwealth v. Yanoff*, 690 A.2d 260, 267 (Pa.Super. 1997). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief

---

[3] In any event, assuming, *arguendo*, Appellant has not waived the claim, and the trial court erred in permitting Dr. Wyke to opine the bite marks on Appellant's arm were made by the victim, we conclude any error was harmless. Appellant's mother testified without objection that the victim bit Appellant. N.T., 9/12/16, at 144. Thus, Dr. Wyke's testimony as to the source of the bite marks on Appellant's arm was merely cumulative. *See Commonwealth v. Levanduski*, 907 A.2d 3, 21 (Pa.Super. 2006) (*en banc*) (holding error harmless where erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence).

has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Moury**, 992 A.2d 162, 170 (Pa.Super. 2010) (citation omitted).

Here, Appellant filed a timely notice of appeal and preserved his issue in a motion for reconsideration under Pa.R.Crim.P. 720. Appellant failed to include a separate statement in his brief pursuant to Pa.R.A.P. 2119(f); however, as the Commonwealth failed to object to its omission, the defect is not necessarily fatal. **See Commonwealth v. Maneval**, 688 A.2d 1198, 1199 (Pa.Super. 1997).

That said, as the Commonwealth suggests, a review of the argument portion of Appellant's brief reveals that he failed to raise a substantial question concerning the appropriateness of his sentence.[4] Appellant claims the trial court did not adequately consider the mitigating factors. He does not claim that his sentence was excessive; but rather, admitting that he was sentenced in the standard range, he suggests "a mitigated range sentence would be appropriate." Appellant's Brief at 27.

This Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for

---

[4] We note the trial court found that Appellant's challenge did not raise a substantial question. Trial Court Opinion, filed 3/24/17, at 11-12.

our review. **Commonwealth v. Zirkle**, 107 A.3d 127, 133 (Pa.Super. 2014) ("[W]e have held that a claim that a court did not weigh the factors as an appellant wishes does not raise a substantial question."); **Commonwealth v. Disalvo**, 70 A.3d 900, 903 (Pa.Super. 2013). Here, we find Appellant has not presented a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).[5]

In his sixth issue, Appellant contends the jury's verdict is against the weight of the evidence. Specifically, he avers the jury "overlooked" evidence revealing Appellant had no intention of killing the victim. Appellant's Brief at 28. Upon the urging of the trial court, we find this issue to be waived.

Pennsylvania Rule of Criminal Procedure 607 provides, in relevant part, the following:

> (A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
>    (1) orally, on the record, at any time before sentencing;
>    (2) by written motion at any time before sentencing; or
>    (3) in a post-sentence motion.

Pa.R.Crim.P. 607.

It is well settled that an appellant must present his challenge to the weight of the evidence to the trial court for a review in the first instance. **See**

---

[5] In any event, it is clear the trial court had the benefit of a pre-sentence investigation report. N.T., 12/5/16, at 2. Where the sentencing court had the benefit of a presentence investigation report, the appellate court assumes the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. **See Moury**, **supra**.

Pa.R.Crim.P. 607(A); ***Commonwealth v. Griffin***, 65 A.3d 932, 939 (Pa.Super. 2013). "Thereafter, appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." ***Commonwealth v. Stiles***, 143 A.3d 968, 980 (Pa.Super. 2016) (citation omitted).

In the case *sub judice*, Appellant did not present a weight of the evidence claim in his post-sentence motion, nor did he challenge the weight of the evidence either prior to or during his sentencing hearing.[6] Consequently, waiver applies to this claim.[7]

In his final claim, Appellant contends the evidence is insufficient to sustain his conviction for voluntary manslaughter.

Our review of a challenge to the sufficiency of the evidence is guided by the following:

> There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden "by means of wholly circumstantial evidence." Further, we note that the entire trial

---

[6] Appellant was advised of his post-sentence and appellate rights. N.T., 12/5/16, at 41.

[7] Appellant included his weight of the evidence claim in his Pa.R.A.P. 1925(b) statement; however, absent the filing of an earlier motion, the issue is waived. ***See Commonwealth v. Sherwood***, 603 Pa. 92, 982 A.2d 483, 494 (2009). We note the trial court declined to address the merits of the issue in its Rule 1925(a) opinion.

record is evaluated and all evidence received against the defendant is considered, being cognizant that the trier of fact is free to believe all, part, or none of the evidence.

***Commonwealth v. Martin***, 627 Pa. 623, 101 A.3d 706, 718 (2014) (citation omitted).

Here, Appellant was convicted of voluntary manslaughter under 18 Pa.C.S.A. § 2503(b), which provides the following:

> **(b) Unreasonable belief killing justifiable.**--A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b) (bold in original).

Appellant contends that he did not "intentionally or knowingly kill" the victim. In this regard, he specifically argues the following:

> [T]here is [in]sufficient evidence to support the jury's finding of guilt beyond a reasonable doubt that Appellant acted with the intent to kill. As previously argued, the evidence shows the victim was stabbed in the leg, not an area someone would stab someone with the intention to kill. There were no stab wounds to [the victim's] chest or neck areas, areas that would should [*sic*] intention.

Appellant's Brief at 31.

> The term "voluntary manslaughter" contemplates an intentional or voluntary act on the part of the defendant. [Our Supreme Court has] stated "that where there is a nonmalicious felonious killing with a specific intent either to kill or to seriously injure, it is voluntary manslaughter.". . .[The Supreme Court has] indicated that a necessary element of both murder in the first degree and voluntary manslaughter is the specific intent to kill.

***Commonwealth v. Mason***, 474 Pa. 308, 378 A.2d 807, 808 (1977) (citations and quotations omitted).

Here, the evidence reveals that Appellant and the victim argued and then engaged in a physical fight, during which time Appellant stabbed the unarmed victim three times in the leg. The Commonwealth's forensic pathologist, Dr. Ross, testified the three wounds were "methodical and controlled. They're not random. They're not accidental. They're purposeful and they're very specifically lined up with one another and there's three distinct motions that had occurred." N.T., 9/12/16, at 31-32. He also noted the wounds resulted from "deep" thrusts. ***Id.*** Further, in reconstructing the fight, Dr. Ross testified the victim's injuries were consistent with defensive wounds, as well as being violently attacked from behind. ***Id.*** at 42. Moreover, Dr. Scaff, the treating emergency room doctor and surgeon, testified that two of the lacerations, one above and one below the knee, were "large," meaning five to seven inches long. N.T., 9/8/16, at 116-117. The laceration above the knee, on the inside of the leg, was deep enough to expose muscle tissue. ***Id.*** at 117. Mrs. Crothers' testified that, immediately after the stabbing, the victim had a "gash and the white artery was hanging out of his leg." N.T. 9/12/16, at 145.

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we agree with the trial court that there was sufficient evidence supporting the jury's verdict that Appellant "intentionally or

knowingly killed" the victim as is required for voluntary manslaughter. ***See***

***Mason***, ***supra***.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/28/18

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA


COMMONWEALTH OF PENNSYLVANIA      :   NO. 106 CR 2016
     :
vs.      :
     :
MATTHEW DYLAN CROTHERS,      :
     :   MOTION TO SUPPRESS
         Defendant.      :


## OPINION

This matter comes before the Court on Matthew Dylan Crothers's ("Defendant") Motion to Suppress his statements to police in violation of his constitutional right to counsel. The underlying facts and procedural history are summarized as follows:

On June 9, 2014, Defendant was interviewed by Pennsylvania State Police Troopers Eric Porpiglia and Bruce Wesnak in relation to a stabbing incident involving Defendant and his brother, David Cody Crothers (hereinafter "Victim"). On November 20, 2015, Troopers Porpiglia and Wesnak filed a criminal complaint against Defendant alleging Defendant had committed the crime of Criminal Homicide. The affidavit of probable cause relies, in relevant part, on statements Defendant made during the June 9, 2014, interview. The affidavit states that Defendant and Victim were engaged in a fight when Defendant stabbed Victim in the leg three times. As a result of these injuries, Victim was transported to the hospital where he died on June 13, 2014, due to a severed femoral artery.

Defendant waived his preliminary hearing and on February 8, 2016, he was charged by Criminal Information with Criminal Homicide[1] and Possession of an Instrument of Crime.[2] On

---

[1] 18 Pa. C.S.A. § 2501(a).

May 2, 2016, Defendant filed the present Motion to Suppress the statements he made during the June 9, 2014, interview. We held a hearing on May 23, 2016, where the Commonwealth presented the following evidence: (1) an audio recording of Defendant's June 9, 2014, interview with Troopers Porpiglia and Wesnak, (2) a transcription of said interview, and (3) a waiver of rights form signed by Defendant.[3] At the conclusion of the hearing, we ordered counsel to file briefs, which we timely received. Having reviewed the record, evidence, and briefs, we are ready to dispose of this matter.

A criminal suspect must be apprised of his *Miranda*[4] rights when he is (1) in police custody and (2) under interrogation. *Commonwealth v. Turner*, 772 A.2d 970, 973 (Pa. Super. 2001). Police custody need not be formal arrest—if "the person is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted," then that individual is in custody for the purposes of his Fifth Amendment right to an attorney. *Commonwealth v. Williams*, 650 A.2d 420, 427 (Pa. 1994). Courts should look at the totality of the surrounding circumstances in determining whether a custodial interrogation has occurred. *See Commonwealth v. Mannion*, 752 A.2d 196, 200 (Pa. Super. 1999). When a defendant alleges that evidence was obtained in violation of his constitutional rights, the burden is on the Commonwealth to prove the defendant knowingly and voluntarily waived his right. *Commonwealth v. Kunkle*, 79 A.3d 1173, 1180 (Pa. Super. 2013).

There is no dispute that Defendant was in custody when he spoke with police on June 9, 2014. *See* Def.'s Br., pp. 1–2; Com.'s Br., pp. 1–2; Com.'s Ex. 2, 00:00:21–00:00:25; Com.'s Ex. 3, p. 2. There is also no dispute that this interaction with the police was an interrogation for

---

[2] § 907(a).
[3] These exhibits are cited throughout as "Com.'s Ex. 1," "Com.'s Ex. 2," and "Com.'s Ex. 3," respectively.
[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

the purposes of *Miranda*. *See* Def.'s Br., pp. 1–2; Com.'s Br., pp. 1–2. Furthermore, the police clearly advised Defendant of his *Miranda* warnings. *See* Com.'s Ex. 1; Com's Ex. 2, 00:00:25–00:01:08; Com.'s Ex. 3, p. 2. Finally, Defendant does not seem to challenge his initial waiver as unknowing or involuntary. *See* Def.'s Br., p. 2 ("Although [Defendant] was read his Miranda Rights and signed a waiver, he can still invoke his rights at any time during the interrogation."). The only issues that have been presented are whether Defendant subsequently invoked his right to an attorney and, if so, whether continued questioning by police violated his constitutional rights.

Courts have long held that "once a defendant has validly invoked [his] *Miranda*-based right to have counsel present during questioning, interrogation must be suspended." *Commonwealth v. Bland*, 115 A.3d 854, 855 (Pa. 2015) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–58 (1981)). The constitutional rights protected by *Miranda* are indispensable to ensuring that inherently compelling pressures do not "undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. The United States Supreme Court has refined these rules by holding "that, after a knowing and voluntary waiver of *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 462 (1994). An inquiry into whether such a request has been made is an objective one. *Commonwealth v. Martin*, 101 A.3d 706, 725 (Pa. 2014) (citing *Davis*, 512 U.S. at 458–59).

If an individual's request for an attorney is ambiguous or equivocal, questioning need not cease. *Davis*, 512 U.S. at 459. Additionally, the Supreme Court's rulings do not require law enforcement officers to ask clarifying questions about whether an individual has asked for an attorney. *Id.* at 461. Thus, to invoke the right to counsel after previously waiving the same, an

3

accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Requiring officers to immediately cease questioning when they do not reasonably know whether the suspect desires to have counsel present, "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity," because in many instances, an ambiguous reference would be made by suspects who do not actually desire counsel's presence. *Id.* at 460 (quotation omitted). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459 (citation omitted).

In the present case, the following portions of Defendant's conversation with Troopers Porpiglia and Wesnak are relevant:[5]

> Matthew Crothers – I just — I just wanna know what you're getting at.
>
> Tpr. Wesnak – The only person that knows the truth is you.
>
> Tpr. Porpiglia – Yea that's what we are getting at. We don't really know.
>
> Matthew Crothers – I'm just scared to say anything 'cause I don't want to, like, incriminate myself to something that is wrong, to something that is not true.
>
> Tpr. Wesnak – Well if you don't tell us the truth we are not going to know.
>
> Matthew Crothers – Well if I don't talk to somebody who's on my side like a lawyer or something then I don't know what I'm supposed to say, you know what I mean? I don't know what's going on.
>
> Tpr. Wesnak – The only thing you're supposed to say —

---

[5] These portions of the taped conversation occur after Troopers Porpiglia and Wesnak read Defendant his *Miranda* rights and after Defendant executed a waiver of same. Com's Ex. 2, 00:00:25–00:01:21; Com's Ex. 3, pp. 2–3; Com.'s Ex. 1.

4

Matthew Crothers – I don't know what's going on with my brother, I don't know if he is dead or alive.

Tpr. Wesnak – The only thing you're supposed to say is the truth, that's the only thing.

Tpr. Porpiglia – We are not going to force you to say anything. We are not going to —

. . .

Tpr. Wesnak – The only person that can help you right now is you. I mean, if you want to straighten out your life —

Matthew Crothers – Yea but the only person to screw me is me too. I could screw me and I could help me. And I could screw me by trying to help me. Do you understand?

Tpr. Wesnak – No.

Matthew Crothers – Well, I know either way I'm going to jail and I'm going to sit there for a long-ass time probably. And it sucks 'cause I didn't do anything.

Tpr. Wesnak – And you don't want to tell your side of the story, what happened?

Matthew Crothers – I don't know. I don't know if I can or not. I don't know what to do. I'm scared. I'm scared.

Tpr. Wesnak – I understand you're scared. It's a very serious situation.

Matthew Crothers – I'm going to be completely honest with you. I didn't do anything wrong. I — It was an accident.

Tpr. Wesnak – If you did nothing wrong, then you need to explain that to us.

Matthew Crothers – Yea but I don't — I don't know. You just see this crap on TV and stuff and it's like — I feel like I should talk to a lawyer before I say anything to you people.

Tpr. Wesnak – Is this TV? This isn't TV.

Matthew Crothers – Yea but TV's real life too.

Tpr. Wesnak – No it's not.

Matthew Crothers – Yea it is. People sitting in these chairs on TV. It's the same thing.

Tpr. Wesnak – No it's not. TV is a fantasy land.

Matthew Crothers – I know, but —

Tpr. Wesnak – This is the real thing. This is your real life. This is our real lives. This is your family's real life. Ok, it's not a game.

Matthew Crothers – I know but I just feel like —

Tpr. Wesnak – And you sit there and say I didn't do nothing wrong, I'm an innocent person. Then you gotta tell us that. Explain why you think you're an innocent person. Because if you don't then I got to go with what everybody else says. The part of trying to straighten up your life and trying to get it together is, explain yourself and what's going on.

Matthew Crothers – Well the only this is I don't know—I don't want to start saying anything because I haven't got it figured out in my head yet. I don't know what happened because it was so quick and so crazy and I was — and everyone's screaming. Everyone's yelling and — and —

Tpr. Wesnak – Why don't —

Tpr. Porpiglia – Why don't —

Matthew Crothers – Because I don't wanna — You know what? Listen, listen, listen. Please don't — please don't interrupt me. Like, I tell my Mom this all the time and it just ticks me off and it messes up my brain, it messes up my organization. But I don't want to start telling what happened because every single little word that I'm saying right now is on that tape. And every single little word that I'm saying can be used against me and can be used to screw me over. And I'm — You know what I mean? Like, if I mess up — Like, 'cause I can't — I haven't figured it out yet. I'm stressed out and I'm so freaked out right now—

Tpr. Wesnak – Uh huh.

Matthew Crothers – — by what happened. I haven't figured out what happened, it was so quick and so fast and I'm rolling around on the floor and I have no idea what's going on and then everyone is screaming and flipping out and my brother is beating the crap out of me and I don't know what's going on and I don't know — I haven't got it figured out in my

own head so if I don't have it figured out in my own head, how am I going to explain it to you guys? Do you understand?

Tpr. Wesnak – Uh huh.

Matthew Crothers – And that's why I'm scared and that's why I don't want to say anything cause I —

Tpr. Wesnak – Well do you sleep in the same room with your brother?

Matthew Crothers – No.

Com's Ex. 2, 00:10:33–00:15:55; Com's Ex. 3, pp. 9–13.[6] From this point on, Defendant continues to answer questions posed by Troopers Porpiglia and Wesnak about the events leading up to and surrounding Victim's lethal injuries. Com's Ex. 2, 00:15:56–01:03:35; Com's Ex. 3, pp. 13–41.

Defendant argues that despite being read, and subsequently signing a waiver of his right to an attorney,[7] his statements to police should nonetheless be suppressed because during the interrogation, after he signed the waiver, he unequivocally requested an attorney. Def.'s Br., pp. 2–3. Defendant avers that this request should have halted all questioning by police until he was provided with counsel as he had effectively invoked his constitutional right. *Id.* Defendant claims that he requested an attorney twice during his interrogation. Def.'s Br., pp. 1–2 (citing Com's Ex. 3, p. 12 as reading "I should talk to a lawyer before I say anything to you."). Defendant further avers that he was interrupted multiple times by the Troopers, showing the Troopers ignored his

---

[6] These excerpts are corrected versions of the written transcript of Defendant's interview based on the audio recording.

[7] In his "Question Presented," Defendant asks whether his "Sixth Amendment right to counsel [was] violated" but argues in his brief that his Fifth Amendment right to counsel was violated. Def.'s Br., p. 2. As Defendant had not been charged with any crime at the time of the interview, his Sixth Amendment right to counsel had not yet attached. U.S. CONST. amend. VI; PA. CONST. art. I, § 9; *see also Commonwealth v. Keaton*, 45 A.3d 1050, 1065–66 (Pa. 2012) (stating the Sixth Amendment right to counsel is "offense-specific . . . and it only attaches at the commencement of prosecution, *i.e.*, when the criminal proceedings are initiated by charge, preliminary hearing, indictment, information, or arraignment."). Thus, we only address Defendant's Fifth Amendment right to counsel herein.

clear request for an attorney and instead redirected the interrogation. Def.'s Br., p. 3 (citing Com's Ex. 3, p. 13).

The Commonwealth responds that under these circumstances, Defendant's two statements regarding counsel were "equivocal at best." Com.'s Br., p. 8. The Commonwealth avers that under the rules created by *Davis*, Defendant's statements were not clear requests for an attorney and that the statements could, at most, lead a reasonable investigator to believe Defendant *might* have been requesting counsel. Com.'s Br. pp. 6–9 (citing *Davis*, 512 U.S. 452; *Martin*, 101 A.3d 706). Furthermore, the Commonwealth points to the relaxed nature of the interrogation with Troopers Porpiglia and Wesnak as showing Defendant was free to specifically request an attorney at any time but failed to do so. Com.'s Br., p. 9–10.

After review of the audio recording and accompanying transcript, we find that Defendant did not clearly request an attorney and, thus, did not effectively invoke his constitutional right to counsel. Defendant mentions "a lawyer" twice during the interview with Troopers Porpiglia and Wesnak: "Well if I don't talk to somebody who's on my side like a lawyer or something then I don't know what I'm supposed to say, you know what I mean?" and "I feel like I should talk to a lawyer before I say anything to you people." Com.'s Ex. 2, 00:10:51–00:10:55, 00:13:45–00:13:49; Com.'s Ex. 3, pp. 10, 12. When read in context, neither of these statements are unequivocal requests for counsel.

The first time Defendant mentions "a lawyer" was not a clear request for an attorney. The context of the situation objectively shows that Defendant's primary concern is being able to accurately formulate his thoughts and statements. *See* Com.'s Ex. 2, 00:14:43–00:14:58; Com.'s Ex. 3, p. 12. According to the totality of the exchange between Defendant and the Troopers, Defendant does not base his ability to formulate those thoughts on speaking with an attorney.

8

Defendant's statement that "[I]f I don't talk to somebody who's on my side like a lawyer or something then I don't know what I'm supposed to say," is, at most, an objective indication that he *might* want to speak with an attorney. *See Davis*, 512 U.S. at 459. We also note that Defendant had previously demonstrated his understanding of his *Miranda* rights, generally, by stating: "I'm just scared to say anything 'cause I don't want to, like, incriminate myself to something that is wrong, to something that is not true." Com.'s Ex. 2, 00:10:40–00:10:48; Com.'s Ex. 3, p. 9. Furthermore, Trooper Porpiglia immediately thereafter reminds Defendant that "We are not going to force you to say anything." Com.'s Ex. 2, 00:11:06–00:11:08; Com.'s Ex. 3, p. 10. The tone of the conversation is heavy, as the subject is serious, but not over-bearing. Indeed, Trooper Wesnak reinforces the seriousness of the situation, Com.'s Ex. 2, 00:13:32– 00:13:34; Com.'s Ex. 3, p. 11, but neither Trooper speaks in an over-bearing manner. *See generally*, Com.'s Ex. 2. Under these circumstances, Defendant had not clearly made a request for counsel and Troopers Porpiglia and Wesnak were not required to cease questioning. Thus, the Troopers did not violate Defendant's rights by continuing the interrogation. *Davis*, 512 U.S. at 459.

Likewise, the second time Defendant mentions "a lawyer" was not a clear request for an attorney. While reading Defendant's statement as he quotes it in his brief—"I should talk to a lawyer before I say anything to you"—might, as quoted, lead to the conclusion that this statement is an objective request for an attorney, Defendant's actual statement, in its entirety and read in context, yields the opposite result. Defendant's full statement is "You just see this crap on TV and stuff and it's like — I feel like I should talk to a lawyer before I say anything to you people." Com.'s Ex. 2, 00:13:43–00:13:49; Com.'s Ex. 3, p. 12. Defendant's comment was said in the context of referencing police interviews on television. Trooper Wesnak is quick to remind

9

Defendant that what he sees on television and what is happening between them at the station are not identical situations, Com.'s Ex. 2, 00:13:49–00:14:06; Com.'s Ex. 3, p. 12, and he was not required to ask Defendant for further clarification. *See Davis*, 512 U.S. at 461.

Furthermore, Defendant explains that his reluctance to speak is based on his ability to formulate his thoughts surrounding the chaotic events and not the absence of counsel. Com.'s Ex. 2, 00:14:43–00:15:48; Com.'s Ex. 3, pp. 12–13. To the extent Defendant argues the interruptions by Troopers Porpiglia and Wesnak amount to compulsion, Def.'s Br., p. 4, we disagree. Later in the conversation, Defendant shows he is capable of dealing with said interruptions and explains to the Troopers that he does not appreciate, nor will he tolerate, being cut off in conversation. Com.'s Ex. 2, 00:14:59–00:15:07; Com.'s Ex. 3, pp. 12–13. Defendant calmly and articulately relates these preferences to the Troopers and after Defendant's explanation, the Troopers refrain from speaking over or interrupting Defendant while he recounts the altercation with Victim. Com.'s Ex. 2, 00:15:56–01:03:35; Com.'s Ex. 3, pp. 13–41. Thus, Defendant's argument that the constant interruptions overbore his will is belied by the record before us.

Under these circumstances, Defendant, again, had not clearly made a request for counsel and Troopers Porpiglia and Wesnak were not required to cease questioning. Thus, the Troopers did not violate Defendant's rights by continuing the interrogation. *Davis*, 512 U.S. at 459.

Having found that Defendant did not make any clear or unequivocal requests for counsel, Defendant's statement was not obtained in violation of his constitutional rights and will not be suppressed. Accordingly, we enter the following Order:

10

## COURT OF COMMON PLEAS OF MONROE COUNTY
## FORTY-THIRD JUDICIAL DISTRICT
## COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA      :   NO. 106 CR 2016

         : 

        vs.          : 

         : 

MATTHEW DYLAN CROTHERS,          : 

         :   **MOTION TO SUPPRESS**

        **Defendant**          : 

### ORDER

**AND NOW**, this 14th day of July, 2016, upon review of Defendant's Motion to Suppress, and in consideration of the record, the evidence presented at the hearing on said motions, and the parties' subsequent briefings, Defendant's Motion to Suppress is **DENIED**.

A pretrial conference has been scheduled for **August 5, 2016, at 1:30 p.m.**, in Courtroom 1, Monroe County Courthouse, Stroudsburg, Pennsylvania. Furthermore, this case shall remain on the **September 2016 Trial Term**.

BY THE COURT,

MARGHERITA PATTI-WORTHINGTON, P.J.

cc:    Matthew J. Bernal, ADA
       Frederick Cutaio, APD
       Court Administration
       Clerk of Courts
       MPW2016-0028