J-S31019-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| HOWARD BISHOP | : | |
| Appellant | : | No. 870 EDA 2023 |

Appeal from the PCRA Order Entered March 10, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0000199-2009

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| HOWARD BISHOP | : | |
| Appellant | : | No. 871 EDA 2023 |

Appeal from the PCRA Order Entered March 10, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0000201-2009

BEFORE:  BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED DECEMBER 3, 2024**

Howard Bishop appeals from the order denying his Post Conviction Relief Act ("PCRA") petition. **See** 42 Pa.C.S.A. §§ 9541-9546. Bishop raises several claims of ineffectiveness of counsel. We affirm.

The facts of this case were previously summarized as follows:

> On September 6, 2008, at about 5:30 PM, Jermaine Myers was driving his car, a gray 1992 Oldsmobile, in the Gratz and York Streets area in Philadelphia. It was still

"broad daytime," but it was raining hard that day. His nephew, Jeff[er]y Hastings ("Hastings"), who shared a residence with Jermaine Myers and his mother Bernice Myers, asked Jermaine Myers to give him a ride and was a passenger in that same vehicle.

Several weeks prior to September 6, Jermaine Myers had a confrontation with [Bishop], who was from the same neighborhood. The altercation was related to [Bishop] putting drugs in manholes on the block.

Jermaine Myers and Hastings had to pass the area of Gratz and York where [Bishop] was frequently seen. Before they drove off, Jermaine Myers took off his gun, a .45, from his waist and passed it to Hastings. Hastings put the gun on his lap.

As they were approaching the Gratz and York intersection, [Bishop] suddenly appeared and started shooting at them. First, he fired two or three shots at the passenger's side of the car where Hastings was sitting. [Bishop] was five to ten feet away from the passenger's side as he was shooting. [Bishop] then moved around to the driver's side and, standing five to ten feet away from Jermaine Myers, fired six to seven shots in his direction.

At that point, Hastings, who "ducked" when he heard those first shots, lifted his head and shot back at [Bishop]. Hastings recognized [Bishop], whom Jermaine Myers had pointed out to him many times before as the person with whom he had an altercation. After [Bishop] heard the gunshot, he started running back in the direction from which he had come; as he was running, he continued shooting.

Jermaine Myers drove the car about 18 feet up the block; he then told Hastings that he was shot. He asked Hastings to drive him to the hospital. Hastings got in the driver's seat and drove the car to Temple University Hospital. As they were going to the emergency department, Jermaine Myers "blanked out" and fell down. An ambulance came, and he was rushed to the emergency room. Wounded to his abdomen, Myers was pronounced dead as a result of his injuries three days later. Hastings was also injured with a graze wound to his leg from one of the shots directed at him.

- 2 -

Bernice Myers, the decedent's mother, testified that the decedent lived with her at 2335 North Gratz Street, around the middle of the block of Gratz and York streets. Ms. Myers stated that, approximately three weeks before the decedent was shot, he was threatened by someone "down at the corner of [their] block." She noted that from then on, whenever the decedent was ready to come home, he would first call her at home from his cell phone, and ask her to look out the door and check for him "if there was anybody down there" at that corner of Gratz and York. He would only come home when he was certain that there was a "bunch of people" at that corner. Ms. Myers stated that these call[s] were being made for about three weeks before her son was shot. She noted that the decedent felt "threatened" and was "scared."

\*\*\*

Elvira Datts, decedent's girlfriend[,]. . . testified that, prior to September 6, 2008, the decedent told her that he "got into a fight with a young boy on the corner of his block." She stated that the decedent showed that person to her about two weeks before he was shot. Ms. Datts pointed to [Bishop] when asked if she could identify that person.

Ms. Datts also testified that on September 6, 2008, the decedent was trying to reach her by phone when he was shot and that he left a voicemail for her. Further, Ms. Datts testified that in that recorded message, the decedent was saying, "I've been shot, I've been shot," and "I can't breathe." Ms. Datts also stated that there was also another person's voice in the recording and that other person was saying, "I need to drive, I need to drive." She confirmed that she recognized the voice in the recording as belonging to "Jeff" [Hastings], the decedent's nephew.

***Commonwealth v. Bishop***, No. 765 EDA 2014, 2015 WL 6965952, at \*1 (Pa.Super. filed June 25, 2015) (quoting trial court opinion) (citations to trial transcript omitted).

A jury convicted Bishop of third-degree murder, aggravated assault, and possession of an instrument of crime.[1] The court sentenced Bishop to an aggregate term of 16 to 32 years' imprisonment. Bishop appealed and we affirmed his judgment of sentence. ***See id.*** In February 2016, the Supreme Court of Pennsylvania denied Bishop's petition for allowance of appeal.

In May 2016, Bishop filed a *pro se* PCRA petition. He subsequently retained counsel who filed an amended PCRA petition. An evidentiary hearing on the petition was held on November 9, 2022. On March 10, 2023, the PCRA court denied the petition. This appeal followed.

Bishop raises the following issues:

I. Did the [c]ourt below err in concluding that counsel was not ineffective for:

A. failure to obtain an expert for the defense regarding gunshot residue?

B. failure to file a suppression motion with respect to eye witness testimony?

C. [f]ailure to argue on appeal well-preserved objections to hearsay testimony as to statements allegedly made by the deceased?

D. [f]ailure to submit a limiting instruction for the court's consideration, relating to the purpose for which the aforesaid hearsay was admitted?

E. [f]ailure to argue on appeal the highly prejudicial use of the victim's phone call to his girlfriend while on the way to the hospital?

_____

[1] 18 Pa.C.S.A. §§ 2502(c), 2702(a), and 907(a), respectively.

F. [f]ailure to object and move for a mistrial due to prosecutorial misconduct during closing?

II. Did the court below err in not finding cumulative prejudice from the multiple instances of ineffective assistance of counsel?

Bishop's Br. at 2-3.

On appeal from the denial or grant of relief under the PCRA, our review is limited to determining "whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Presley**, 193 A.3d 436, 442 (Pa.Super. 2018) (citation omitted).

Bishop raises claims of counsel's ineffectiveness. "[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." **Commonwealth v. Rivera**, 10 A.3d 1276, 1279 (Pa.Super. 2010). To obtain relief based on a claim of ineffectiveness, a petitioner must establish: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." **Commonwealth v. Spotz**, 84 A.3d 294, 311 (Pa. 2014). Prejudice in this context means that, "absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different." **Commonwealth v. Velazquez**, 216 A.3d 1146, 1149 (Pa.Super. 2019) (citation omitted). A failure to meet any of these prongs bars a petitioner from obtaining relief. **Commonwealth v. Sneed**, 45 A.3d 1096, 1106 (Pa. 2012).

Bishop first argues that trial counsel was ineffective for failing to obtain an expert to counter the testimony of the Commonwealth's expert in gunshot

residue. Bishop's Br. at 14. The Commonwealth's expert had tested Bishop's clothing and found particles consistent with gunshot residue. The Commonwealth introduced this evidence at trial to show that Bishop had recently fired a gun. Bishop argues that trial counsel should have obtained an expert "who would have stressed the importance of chain of custody in ensuring that the sample is not cross-contaminated." *Id.* He notes that the clothing bearing gun residue was found among a pile of clothes in his closet three weeks after the shooting. *Id.* at 24. Therefore, he emphasizes that since the testing was not analyzed immediately after the shooting, it could have been subject to cross-contamination. *Id.* at 14.

In support of his position, Bishop called an expert on chemical analysis and chain of evidence relating to gunshot residue to testify at his PCRA evidentiary hearing. N.T., 11/9/22, at 4-5. The expert agreed with the Commonwealth's expert that gun residue was found on Bishop's clothing but stated that since the clothing was found comingled with other items in his closet, there was the possibility of cross-contamination. *Id.* at 20, 28, 30. She testified that there was "a potential there for particles to have really come from anything else that made its way into the closet, other clothing items, shoes, bags," and "[a]nything that might fit into that closet could have brought the gunshot residue particles that then distributed onto these clothes." *Id.* at 20. The expert also pointed out that since the testing of the clothes was not done until three weeks after the shooting, "there's 21 days in which we just don't know what was happening with the -- the clothing." *Id.*

at 21. She testified that there was also two-day gap in the chain of custody of the clothing "between collecting it from the house and it ending up at the laboratory." *Id.* at 19.

"[T]o demonstrate counsel's ineffectiveness for failure to call a witness, a petitioner must prove that the witness existed, the witness was ready and willing to testify, and the absence of the witness' testimony prejudiced petitioner and denied him a fair trial." ***Commonwealth v. Luster***, 71 A.3d 1029, 1047 (Pa.Super. 2013) (*en banc*) (cleaned up). "In particular, when challenging trial counsel's failure to produce expert testimony, 'the defendant must articulate what evidence was available and identify the witness who was willing to offer such evidence.'" ***Id.*** (quoting ***Commonwealth v. Bryant***, 855 A.2d 726, 745 (Pa. 2004)).

The PCRA court found Bishop's expert had no factual basis to claim the evidence was contaminated and thus failed to show prejudice:

> [T]he PCRA [c]ourt properly dismissed this claim after an evidentiary hearing because [Bishop] proffered no evidence suggesting he was prejudiced by counsel's failure to retain its own witness. While the evidence could not be tested because of water damage, [Bishop] called an expert to attempt to discredit the evidence; the new expert claimed that the twenty-one days while [Bishop] eluded arrest and likely still had the clothing meant that the origin of the gunshot residue on the clothing was uncertain. The expert went on to claim that it could have come from cross-contamination with the rest of [Bishop's] clothes in his closet. The expert also claimed that calling the particles "unique" to gunshot residue was outdated at the time of testimony and the particles should have been referred to as "characteristic of" gunshot residue.

That the PCRA [c]ourt found the hypothetical danger of cross-contamination in [Bishop's] own closet to be unpersuasive is consistent with the law, which does not require a perfect chain of custody for evidence. The expert did not offer any factual basis to advance a theory of cross-contamination, only speculation, and merely critiqued the exact language of the trial expert's testimony. The PCRA [c]ourt evaluated the testimony presented and correctly concluded that speculation based on a gap in the chain of custody is insufficient to establish that the witness would have been arguably beneficial to the defense . . . [T]he expert in this case agreed there were characteristic elements of gunshot residue on the clothes but speculated that [Bishop's] other clothing could have had gunshot residue left on it or a potential lab contaminant which would only affect the weight given to the evidence.

PCRA Court Opinion, filed 10/27/23, at 16-17 (citation omitted).

The PCRA court did not err. Bishop's expert agreed with the Commonwealth's expert that gun residue was found on Bishop's clothing. The remainder of Bishop's expert's testimony was based on speculation that the sample was possibly contaminated. There was no evidence presented that the sample in this case was contaminated or that anything improper occurred during the chain of custody of the clothing. Moreover, Bishop failed to assert that this expert or any other expert in gunshot residue was willing and available to testify at his trial. Thus, this ineffectiveness claim fails.

Bishop next argues that trial counsel was ineffective for failing to file a motion to suppress Hastings' eyewitness testimony.[2] He asserts that Hastings,

_____

[2] Hastings testified at Bishop's preliminary hearing where he was subject to direct examination by the Commonwealth and cross-examination by defense counsel. N.T., 10/18/10, at 44-45. Hastings failed to appear at the trial, so

*(Footnote Continued Next Page)*

the sole eyewitness to the shooting, "was by his own account, only able to observe his attacker at a distance of 5-10 feet from the driver's side of the vehicle, in a heavy downpour, for only 1-2 seconds, while under fire." Bishop's Br. at 15. He notes that Hastings' description of the gunman changed from someone wearing a mask, to someone with something around his neck, to someone wearing a hoodie. *Id.* at 29. Bishop also points out that when the police showed Hastings a photo array of potential suspects, they showed him pictures of Bishop's "previous record." *Id.* at 15. In Bishop's view, "[t]he combination of the circumstance of suggestive identification, coupled with evidence demonstrating near impossible conditions for observing the assailant, rendered the identification made by this witness insufficiently reliable to be admitted and trial counsel was ineffective for failing to move to suppress it." *Id.*

Bishop further takes issue with the fact that the photo array shown to Hastings was not given to his counsel at the time of the preliminary hearing. *Id.* at 27. He argues that "[h]ad trial counsel brought a proper motion to suppress, it would have been the Commonwealth's burden to make a prima facie case that the photo identification was not suggestive." *Id.* at 28.

When claiming that counsel was ineffective for failing to file a suppression motion, "[t]he defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the

_____

the notes of his testimony from the preliminary hearing were read into the record at trial. *Id.* at 46-110.

evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable." ***Commonwealth v. Watley***, 153 A.3d 1034, 1044 (Pa.Super. 2016) (citation omitted).

"Identification evidence will not be suppressed unless the facts demonstrate that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ***Commonwealth v. Bishop***, 266 A.3d 56, 63 (Pa.Super. 2021) (citation omitted). "Suggestiveness arises when the police employ an identification procedure that emphasizes or singles-out a suspect." ***Commonwealth v. Davis***, 17 A.3d 390, 394 (Pa.Super. 2011). Whether an identification is to be suppressed as unreliable "is determined from the totality of the circumstances." ***Commonwealth v. Stiles***, 143 A.3d 968, 978 (Pa.Super. 2016) (citation omitted). Factors that a court may consider in determining the admissibility of an identification evidence include (1) whether the witness had a chance to view the perpetrator at the time of the crime; (2) the degree of attention of the witness; (3) the accuracy of the description of the perpetrator; (4) the level of certainty the witness has in the identification; and (5) the amount of time between the crime and the confrontation. ***See Commonwealth v. Milburn***, 191 A.3d 891, 899-900 (Pa.Super. 2018).

The PCRA court found that Bishop's ineffectiveness claim for failing to file a motion to suppress Hastings' identification testimony lacked merit because Bishop could not establish he was prejudiced by the failure to file such a motion. ***See*** PCRA Ct. Op. at 9. It pointed out that Hastings knew

- 10 -

Bishop from the neighborhood before the shooting. The court concluded that since Hastings knew Bishop beforehand, "the motion to suppress would be pointless because the testimony would likely be admitted regardless," and thus, Bishop could not show that the outcome of the trial would have been different. *Id.* at 10.

The PCRA court's conclusions are supported by the record and are free of legal error. Hastings made two pretrial identifications in which he identified Bishop as the shooter. One identification was from the photo array shown to him by the police approximately 12 days after the shooting and the other was an in-court identification at Bishop's preliminary hearing. N.T. 10/18/10, 56, 105-06. Hastings made clear that Bishop's photograph was not the only photo shown to him from the photo array. *Id.* at 105-06. Rather, the police showed him photographs of numerous individuals that he did not know, and he identified Bishop as the shooter. *Id.* Further, Hastings testified that he was familiar with Bishop from being "[a]round the neighborhood, in the area" and had seen him ten to 20 times prior to the shooting. *Id.* at 50. Since Hastings was acquainted with Bishop prior to the commission of the crime, there was independent corroboration that the identification procedure was not impermissibly suggestive. There was also no evidence that the police who showed Hastings the photo array did anything leading or suggestive. Thus, Bishop's claim that counsel was ineffective for failing to move to suppress the identification testimony lacks arguable merit. No relief is due. ***See***

*Commonwealth v. Spotz*, 896 A.2d 1191, 1210 (Pa. 2006) (stating "[c]ounsel will not be deemed ineffective for failing to raise a meritless claim").

Next, Bishop argues that counsel was ineffective for failing to challenge on direct appeal the admission of Myers' (the victim) hearsay statements about a prior conflict between him and Bishop. Bishop's Br. at 16. Hastings testified that Myers told him prior to the shooting that Myers and Bishop had an argument "about people coming and sticking drugs on the corners of the manholes." N.T., 10/18/10, at 66. Hastings further stated that Myers had pointed Bishop out to him, as well as the cars that Bishop drove. *Id.* at 91. Datts, Myers' girlfriend, testified that Myers told her he "got into a fight with a young boy on the corner of his block" and he identified Bishop as the person he got into a fight with. N.T., 10/14/10, at 7-8. Myers' mother testified that in the three weeks before the shooting, Myers told her he was being "threatened by a person down at the corner of our block, which is Gratz and York Street." N.T., 10/12/10, at 54. She stated that Myers would call her every time before he was returning to their home to look down the block to see if anyone was on that corner. *Id.*

Over defense counsel's objection, the trial court ruled that Myers' statements to Hastings, Datts, and his mother were admissible. N.T., 10/12/10, at 4-5; 10/14/10, at 7. Bishop argues that these statements were inadmissible hearsay because "[n]one of these witnesses testified from personal knowledge concerning the existence of the claimed dispute, or the identity of the other party to it" and such hearsay did not fall under any

exceptions. Bishop's Br. at 33-34. He maintains that appellate counsel was ineffective for not pursuing the issue on appeal. ***Id.*** at 16, 39.

"An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay[,] . . . is abuse of discretion." ***Commonwealth v. Walter***, 93 A.3d 442, 449 (Pa. 2014). Thus, we will not disturb an evidentiary ruling unless "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record." ***Commonwealth v. Cooper***, 941 A.2d 655, 667 (Pa. 2007) (citation omitted).

"Hearsay is an out of court statement offered to prove the truth of the matter asserted." ***Commonwealth v. Manivannan***, 186 A.3d 472, 480 (Pa.Super. 2018) (citing Pa.R.E. 801(c)). Generally, hearsay is inadmissible unless it falls within one of the exceptions to the hearsay rule. ***Id.*** One exception to the rule against hearsay is the state of mind exception:

> **Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

At the time of Bishop's trial and direct appeal, "out-of-court statements by homicide victims [were] admissible when the statements [were] relevant for some other purpose, such as proof of motive or malice." ***Luster***, 71 A.3d

at 1041 (finding that victim's statement she was afraid of appellant and he was going to harm her was admissible because it showed appellant's ill will and malice toward the victim); **see also Commonwealth v. Kunkle**, 79 A.3d 1173, 1185 (Pa.Super. 2013) (victim's statement that he was scared of appellant and that if he died it would be appellant's fault was admissible as evidence based on state of mind exception).

Here, Myers' statements were offered to demonstrate the existence of a conflict and to prove Bishop's ill will and motive. Further, we conclude that even if admitting Myers' hearsay statements was erroneous, such error was harmless because the statements were cumulative of other evidence adduced at trial. **See Luster**, 71 A.3d at 1042. Accordingly, appellate counsel could not be deemed ineffective for failing to raise the claim on appeal and Bishop is not entitled to relief on this ineffectiveness claim.

Bishop next argues that trial counsel was ineffective for failing to request a cautionary instruction to be read to the jury regarding the above hearsay statements. After the trial court ruled that the statements would be admissible, it stated:

> If it's necessary, at the appropriate time, I will give a cautionary instruction if that becomes necessary. I'll leave counsel to tell me whether he wants me to give that instruction or not, if that becomes an issue.

N.T., 10/12/10, at 4. Bishop's counsel did not make a request for a cautionary instruction. Bishop argues that there was "no reason [for counsel] not to clarify for the jury that the hearsay statements were not admitted for the truth

- 14 -

of whether [he] was a person who was in conflict with the victim." Bishop's Br. at 41-42. Bishop points out that Myers' statements that Bishop was hostile to him "cemented the Commonwealth's identification case" given Hastings' changing descriptions of the shooter. *Id.* at 43. According to Bishop, it was "prejudicial to fail to caution the jury to restrict its use of this evidence for its relevance to the victim's state of mind . . . particularly in light of the court's invitation to him to do so[.]" *Id.* at 43-44.

The decision whether to seek a specific jury instruction "implicates a matter of trial strategy." *Commonwealth v. Johnson*, 179 A.3d 1105, 1119 (Pa.Super. 2018). "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Lesko*, 15 A.3d 345, 380 (Pa. 2011) (citation omitted). "[T]rial counsel may forego objecting to an objectionable remark or seeking a cautionary instruction on a particular point because objections sometimes highlight the issue for the jury, and curative instructions always do." *Commonwealth v. Koehler*, 36 A.3d 121, 202 (Pa. 2012) (cleaned up).

Here, trial counsel testified at the evidentiary hearing that he did not request a cautionary instruction because he did not want to highlight the issue to the jury. N.T., 11/9/22, at 88. The PCRA court credited this testimony. *See* PCRA Ct. Op. at 12. Since counsel had a reasonable basis for his strategy, Bishop's ineffectiveness claim fails.

Next, Bishop argues that appellate counsel was ineffective for not challenging the trial court's ruling permitting Myers' voicemail to his girlfriend, Datts, to be played to the jury. Bishop's Br. at 46-47. After Myers was shot, he called Datts on the way to the hospital and left a voicemail for her. N.T., 10/14/10, at 13-14. In the voicemail, he stated, "I've been shot, I've been shot," and, "I can't breathe." *Id.* at 15. Hastings was heard in the voicemail saying, "I need to drive, I need to drive." *Id.* Over counsel's objection, the court permitted the voicemail to be played for the jury. N.T., 10/12/10, at 4.

Bishop argues that the contents of the voicemail were not relevant and that its prejudicial impact outweighed its content. Bishop's Br. at 45-46. He notes that the voicemail was played twice during the trial – during Datts' testimony and during the Commonwealth's closing argument. *Id.* at 44-45. He argues that the voicemail had no legitimate evidentiary purpose, but rather elicited an emotional response from Datts. *Id.* at 45-46. Bishop maintains that the voicemail "packed a hefty emotional punch" and "was introduced in an attempt to elicit a sympathetic response toward the victim and to divert the jury from dispassionate consideration of the identification issue before them." *Id.* at 46.

The admission of evidence is within the discretion of the trial court and will only be reversed where there is an abuse of that discretion. *See Commonwealth v. Radecki*, 180 A.3d 441, 451 (Pa.Super. 2018). An abuse of discretion exists where the court overrides or misapplies the law or exercises judgment in a way "that is manifestly unreasonable, or the result of

bias, prejudice, ill will or partiality, as shown by the evidence of record." ***Id.*** (citation omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. However, the court may exclude relevant evidence if its probative value is outweighed by unfair prejudice. Pa.R.E. 403. "Unfair prejudice" is defined as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403 cmt.

Here, the PCRA court found that a challenge to the trial court's ruling permitting the voicemail would have been meritless. PCRA Ct. Op. at 19. The PCRA court did not err. The voicemail was relevant to show that Myers had been shot and Hastings drove him to the hospital. The voicemail made no mention of Bishop. Therefore, its probative value outweighed any prejudicial effect. The court also instructed the jury that their determination of the facts should not be based on sympathy for anyone involved in the case, including the deceased or his family. N.T., 10/19/10, at 7. Juries are presumed to follow courts' instructions. ***See Commonwealth v. Chmiel***, 30 A.3d 1111, 1147 (Pa. 2011). No relief is due on this claim.

Next, Bishop argues that trial counsel was ineffective for failing to object and move for a mistrial due to the prosecutor's remarks during closing

argument. Bishop argues that the prosecutor impermissibly appealed to the jury's emotions when she urged them to place themselves in the shoes of Hastings, suggested that Bishop had a "posse" who were responsible for Hastings' failure to testify at trial, and vouched for Hastings' credibility. Bishop's Br. at 19, 54.

Our standard of review of a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. ***Commonwealth v. Rivera***, 939 A.2d 355, 357 (Pa.Super. 2007). "[P]rosecutorial misconduct is evaluated under the harmless error standard[.]" ***Commonwealth v. Cousar***, 928 A.2d 1025, 1042 (Pa. 2007).

"[A]rguments of counsel are not evidence." ***Commonwealth v. Moore***, 263 A.3d 1193, 1206 (Pa.Super. 2021) (citation omitted). "[W]ith specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that any challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered." ***Commonwealth v. Jaynes***, 135 A.3d 606, 615 (Pa.Super. 2016). A prosecutor's statements in closing argument do not merit a new trial unless they had the "unavoidable effect" of "prejudic[ing] the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." ***Id.*** (citation omitted). The prosecution may employ oratorical flair in arguing its version of the case to the jury and may advance arguments and inferences so long as they are supported by the evidence. ***Id.*** Moreover, the prosecutor may fairly respond

to points defense counsel made in closing. ***Id.*** "If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility." ***Commonwealth v. Chmiel***, 889 A.2d 501, 544 (Pa. 2005).

Bishop first maintains that the prosecutor improperly suggested that the jury should place themselves in the position of Hastings to invoke sympathy. Bishop's Br. at 49. Bishop takes issue with the following remarks by the prosecutor during closing argument:

> Imagine you're sitting in a car, and you're just expecting to get a ride, and you're a passenger in a car, and you're expecting a ride, and your uncle hands you a gun.
>
> You know there have been problems, and you're riding down the street and, all of a sudden, gunfire erupts. It's coming from the right, and you're like what?
>
> All of a sudden, you're ducking, you're looking, and you don't know how to react. You don't know how to respond. But, all of a sudden, your life is forever changed.
>
> You can't live where you normally live and, all of a sudden, you're going to a funeral for somebody that was once very much alive, and you're all of a sudden a witness.
>
> \*\*\*
>
> Well, imagine being in the car. Imagine being in the car and then having someone -- and surviving it and having someone ask you questions of where did the shooting start and where did it move to and where did it move to next?

N.T., 10/18/10, at 167-68, 180.

A review of the record shows that these remarks were made in response to defense counsel's closing argument that highlighted the fact that Hastings

failed to appear at trial and attacked Hastings' credibility. ***See id.*** at 159-162. The prosecutor did not ask the jury to place themselves in the shoes of a victim of a violent crime to invoke sympathy. Rather, the prosecutor sought to have the jury take into account the reasons why Hastings failed to appear at trial. Since defense counsel attacked Hastings' credibility in his closing, it was permissible for the prosecutor to present argument addressing credibility. ***See Chmiel***, 889 A.2d at 544.

Bishop next argues that the prosecutor improperly implied that Bishop had a "posse" that intimidated Hastings into not testifying at trial. Bishop contends that the following remarks by the prosecutor were improper:

> You know, trials are very difficult because we have trials in these very sanitized environments, and it's hard as a prosecutor to kind of put you in the frame of mind, the gritty frame of mind of what it must have been like for Jeffery Hastings at the time he was in Temple University Hospital, the time he was in the car, and the time he must have been deciding what it would mean for him to be a witness.
>
> That's not the same decision as what it must mean for everybody. It's scary. It means you get a chance to move. It means you get a chance to be afraid forever.
>
>         ***
>
> Then the audacity, the temerity to say, "Well, I would have run. If I was guilty, I would have run." No. Some people have the temerity and the audacity to sit still because they got posse. I'm not going to say any more than that.

N.T., 10/18/10, at 169-70, 187.

The PCRA rejected Bishop's claim because it lacked arguable merit. PCRA Ct. Op. at 22. It stated:

> [A]fter defense counsel's extensive denigration of Hastings'[] testimony and explicitly asking why he was hiding in West Philadelphia while [Bishop himself] did not run, the prosecutor's remark was a fair response to explain both why [Bishop] did not run and why Hastings did run . . . . [I]n this case, the prosecutor offered a direct answer to defense counsel's questions targeting the credibility of a Commonwealth witness. Furthermore, the trial judge included an instruction to the jury that their evidence must be based on the evidence before it and that closing argument is not evidence[.]

*Id.* at 23 (citation omitted).

The PCRA court did not err. The prosecutor's remarks were a reasonable response to defense counsel's closing argument. The trial court instructed the jury that the arguments and statements of counsel are not evidence. **See** N.T., 10/12/10, at 30; **Moore**, 263 A.3d at 1206. Juries are presumed to follow the court's instructions. **See Chmiel**, 30 A.3d at 1147.

Bishop next argues that the prosecutor improperly vouched for Hastings' credibility. Bishop's Br. at 54. He argues that the following statement by the prosecutor was objectionable:

> I know that it's human nature. Human nature tells all of us things, and I'm guilty of that, too, and there's an expression that you want to see the whites of a witness' eyes. You want to see -- we all wanted Jeffery Hastings to come and sit in that chair.
>
> But I'm here to tell you the truth, it doesn't have eyes. It just is. The truth just is. It doesn't change.
>
> What do I mean by that? What I mean by that is that the law takes into account that people, their courage may faulter, that they may be courageous right in the beginning when the episode happens, and they may faulter, they may become fearful, and so their notes of testimony can come in

- 21 -

> -- I had it here -- their notes of testimony can come in as evidence.

N.T., 10/18/10, at 170.

"Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Chmiel*, 30 A.3d at 1180 (citation omitted).

Here, the PCRA court found that the prosecutor did not improperly vouch for Hastings' credibility. Rather, the court concluded she "was merely responding to the credibility attack on Hastings for not showing up at trial by reaffirming to the jury that the law accommodates situations like this and that jurors must use all the evidence at hand to reach a conclusion." PCRA Ct. Op. at 24.

The court did not err. The above passage does not constitute improper vouching by the prosecutor. She did not argue that Hastings was credible based on her personal knowledge or on information not of record. *See Chmiel*, 30 A.3d at 1180. Accordingly, we agree with the PCRA court that Bishop's claim lacks arguable merit.

Bishop's final claim is that he is entitled to relief because of the cumulative prejudicial effect of counsel's alleged ineffectiveness. Bishop's Br. at 57. Because we have determined that there were no errors warranting relief, Bishop's allegation of cumulative error fails. *See Commonwealth v.*

***Tedford***, 960 A.2d 1, 56 (Pa. 2008) (citation omitted) ("[N]o number of failed claims may collectively warrant relief if they fail to do so individually").

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/3/2024